**Genanett ALEXANDER et al.,
Plaintiffs-Appellants,**

v.

**U. S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and Carla A. Hills, Secretary, Defendants-Appellees.**

**No. 76–1993.**

United States Court of Appeals, Seventh Circuit.

Argued April 13, 1977.

Decided May 20, 1977.

Rehearing and Rehearing En Banc Denied Sept. 19, 1977.

---

Richard L. Zewig, Indianapolis, Ind., for plaintiffs-appellants.

Peter R. Taft, Asst. Atty. Gen., Robert L. Klarquist, Atty., Dept. of Justice, Washington, D. C., James B. Young, U. S. Atty., Indianapolis, Ind., for defendants-appellees.

Before CUMMINGS and PELL, Circuit Judges, and CAMPBELL, Senior District Judge.*

WILLIAM J. CAMPBELL, Senior District Judge.

This is an appeal from an order of the district court granting defendants' motion for summary judgment. The facts are not in dispute.

The seventeen plaintiffs are former tenants of the Riverhouse Tower Apartments (Riverhouse), a complex consisting of two 12-story buildings containing 294 apartments units located in Indianapolis, Indiana. The project was constructed by Riverhouse Apartments, Inc., a private nonprofit corporation and former mortgagor of Riverhouse. Repayment of a loan secured by the mortgage was insured by the Secretary of the Department of Housing and Urban Development (HUD) under § 221(d)(3) of the National Housing Act, as amended, 12 U.S.C. § 1715*l*(d)(3). In accordance with that section, upon the completion of the Riverhouse Project, the interest rate on the loan was reduced to 3%, and the mortgage was purchased by the Government National Mortgage Association.

Riverhouse Apartments, Inc. defaulted on the loan in July, 1970. In December of that year the mortgagee (Government National Mortgage Association) assigned the note and mortgage to HUD. Three years later, in face of the mortgagor's continuing default, HUD initiated a foreclosure action in the Southern District of Indiana. From May, 1973 until September, 1974 Riverhouse was in possession of a court-appointed receiver. A Marshal's sale ensued, and HUD acquired title to Riverhouse.

After the acquisition, HUD employed the Federal Property Management Corporation to manage Riverhouse and to secure needed repairs. However, the condition of Riverhouse had so deteriorated that HUD determined to terminate the project. Affidavits in the record attest to the deplorable condition into which Riverhouse had fallen. The project was infested with roaches and vermin; elevators were often inoperable; security was poor; hot water and heat were inadequate or non-existent; the buildings

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

were often flooded; lighting was poor in the narrow hallways which were often cluttered with garbage; plumbing was deficient, and some tenants had electrical problems.

Recognizing that Riverhouse was plagued by unsafe conditions, nonpayment of rents, and the excessive costs of bringing the project into good condition, HUD caused notices to quit to be served on all tenants. These notices were issued on November 18, 1974, requiring the tenants to vacate Riverhouse by December 31, 1974. By February, 1975 Riverhouse was vacant.

During the time the project was operating, all tenants were required to post a $100.00 security deposit at the time of their initial tenancy. When Riverhouse was terminated, HUD returned the security deposits to all tenants who were current in their rent payments. In the case of five of the plaintiffs, however, HUD applied the amount of their security deposits to the balance of any rent arrears.

In the district court, plaintiffs sought relocation benefits as provided by the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. § 4601 *et seq.* (URA). In support of this contention, plaintiffs asserted that the November 18, 1974 order to vacate Riverhouse made them eligible for benefits afforded to "displaced persons" within the meaning of URA. Further, the five plaintiffs whose security deposits were not returned due to rent arrears sought the return of those monies, alleging that HUD had breached a warranty of habitability which is to be implied in their leases. Owing to this breach, plaintiffs contended, the obligation to pay rent was relieved, and thus HUD wrongfully withheld those security deposits and applied them to the balance of rent arrears. The district court held URA inapplicable to the closing of the Riverhouse Project, and held there is no implied warranty of habitability in plaintiffs' leases. We affirm.

## I.

■ Prior to the enactment of URA, there appear to have been two major legislative provisions for handling most relocation benefits: the Amendments to the Federal Housing Act, 42 U.S.C. § 1465, which provided relocation assistance benefits to persons displaced by urban renewal projects, and the Highway Relocation Assistance Act, Pub.L. 91–605, 84 Stat. 1724, which provided assistance benefits in connection with Federal Aid highway construction projects. In addition to urban renewal and highway construction projects, other legislative provisions dealt with relocation assistance to owners and tenants of land acquired by federal agencies for governmental purposes.[1] All of these relocation assistance provisions were repealed, 84 Stat. 1903, by the enactment of URA. Recognizing the disparities and inconsistencies existing among federal and federally assisted programs with respect to the amount and scope of benefits and other assistances, Congress sought to provide uniform treatment for those forced to relocate as a result of federal and federally aided public improvements programs. House Report No. 91–1556, 91st Cong. 2d Sess.; 1970 U.S.Code Cong. & Admin.News. pp. 5582–5583. *See also:* 42 U.S.C. § 4621.

Relocation assistance under URA is afforded to "displaced persons". 42 U.S.C. § 4601(6) defines a "displaced person" as:

"Any person who . . . moves from real property, or moves his personal property from real property, as the result of the acquisition of such real property, . . . or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency, or with Federal financial assistance; . . . ."

Several cases have discussed the eligibility aspects of URA. Even though persons were displaced by an urban renewal project,

---

1. E. g. 43 U.S.C. §§ 1231 to 1234 (Secretary of the Interior), 42 U.S.C. § 2473(b)(14) (NASA), 10 U.S.C. § 2680 (Military), 49 U.S.C. § 1606(b) (Urban Mass Transportation), 42 U.S.C. § 3074 (Condemnation for Development Programs), and 42 U.S.C. § 3307(b), (c) (Demonstration Cities and Metropolitan Development).

URA was held inapplicable to that project because the federal government had not executed a contract for a loan or grant—an activity held to be determinative of the federal nature of the project. *Feliciano v. Romney*, 363 F.Supp. 656, 672 (S.D.N.Y. 1973). *But see: LaRaza Unida v. Volpe*, 337 F.Supp. 221 (N.D.Cal.1971), *aff'd.*, 488 F.2d 559 (9th Cir. 1973). Further, a person displaced by a project undertaken by a private institution receiving federal financial assistance for that project was found ineligible to receive relocation benefits. *Parlane Sportswear Company, Inc. v. Weinberger*, 381 F.Supp. 410 (D.Mass.1974), *aff'd.*, 513 F.2d 835 (1st Cir. 1975), *cert. denied*, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252. *See also Jones v. HUD*, 390 F.Supp. 579 (E.D. La.1974).

Eligibility for URA benefits is also based on the requirement that a person be displaced "for a program or project undertaken by a Federal agency, or with Federal financial assistance." 42 U.S.C. § 4601(6). This requirement has been interpreted to mean construction of new federal projects. *Jones v. HUD, supra*, 390 F.Supp. at 583.[2] In a case closely resembling the present, the Second Circuit intimated that Congress intended the program or project requirement of 42 U.S.C. § 4601(6) to mean "construction" programs or projects. *Caramico v. HUD*, 509 F.2d 694, 698 (2d Cir. 1974).

In *Caramico*, a mortgagee of low income dwellings was required by FHA regulations to deliver possession of the mortgage property unoccupied in order to recover federal mortgage insurance. Upon default of the mortgagor and subsequent foreclosure, the mortgagee sought to evict the tenants in order to comply with the vacant delivery requirement. The Court found that the evicted tenants were not displaced within the meaning of 42 U.S.C. § 4601(6) since, although there may have been an acquisition within the meaning of that section, the tenants did not show that the acquisition was for a program or project. *Id.*, at 697. Finding a crucial difference between mortgage insurance acquisitions and acquisitions under programs covered by URA, the Second Circuit characterized the former as "random and involuntary while normal urban renewal contemplates a conscious government decision to dislocate some so that an entire area may benefit." *Id.* at 698.

The tenants in this case contend that *Caramico* is distinguishable factually since in *Caramico* HUD was not the mortgagee, did not foreclose on the mortgage, and did not purchase the property from which the tenants were evicted. Further, plaintiffs argue *Caramico* involved the acquisition aspect of 42 U.S.C. § 4601(6), whereas here plaintiffs rely on the aspect of that section dealing with the written order to vacate by the acquiring agency. Finally, plaintiffs seek to distinguish *Caramico* by arguing that the mortgagee in that case was FHA, and since under 12 U.S.C. § 1717(b), the FHA had to convey to HUD, the conveyance was involuntary. But in this case, HUD was not compelled to purchase Riverhouse, nor was HUD required to issue the order to vacate.

Although distinguishable with respect to particular facts, *Caramico* involved the same inquiry as presented by this case, i. e., whether the activity of the governmental agency was "for a program or project undertaken by a Federal agency, or with Federal financial assistance." In this case, we conclude that HUD's written order to the tenants of Riverhouse to vacate by December 31, 1974 was not for such a program or project.

The terms "program" and "project" are not defined in URA, nor does the legislative history illuminate Congress' intent with respect to those terms.[3] Without any express

---

**2.** The *Jones* opinion refers to an earlier unpublished opinion of the same district court. The reported decision lacks any analysis of the requirement that the claimant of URA benefits be displaced for a program or project undertaken by a Federal agency or with Federal financial assistance.

**3.** In intimating that these terms were intended by Congress to mean "construction" programs

indication from Congress as to what it meant by the use of these terms, we look to the objectives sought to be accomplished through the enactment of URA. 42 U.S.C. § 4621 states:

"The purpose of this subchapter is to establish a uniform policy for the fair and equitable treatment of persons displaced as a result of Federal and Federally assisted programs in order that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole."

As this declaration of policy indicates, programs and projects are those activities designed for the benefit of the public as a whole. Thus, persons displaced by such programs are persons displaced by governmental activities involving the acquisition of land to accomplish an objective benefiting the public or fulfilling a public need. In this regard, an order by HUD to vacate a public housing project because that project had become an irretrievable failure cannot be considered such a program or project. HUD's decision to abandon the Riverhouse Project and its order to the tenants to vacate the facility cannot be characterized as a program or project undertaken by a federal agency to accomplish an objective benefiting the public as a whole. Rather, at best, HUD's decision and order to vacate represent a sad recognition that the Riverhouse Project failed to accomplish the government's objective of providing adequate public housing for the needy.

Plaintiffs point out that the purpose behind HUD's decision to order the tenants to vacate Riverhouse is undisclosed from the record, and that the Secretary has several options: rehabilitation, demolition, or sale of the facility. Plaintiffs argue that these undisclosed plans constitute a program or project within the meaning of URA. Riverhouse is a conceded failure as a project to provide public housing. We fail to see how a decision to terminate a project can itself become a project· in the absence of some indication that the decision to terminate and the order to vacate constitute a prelude to some governmental undertaking amounting to a program designed for the benefit of the public as a whole.

II.

■ Five plaintiffs in this action claim that their obligation to pay rent was relieved by HUD's breach of a warranty of habitability which, plaintiffs contend, is to be implied in their leases. Thus, plaintiffs argue, their security deposits were wrongfully withheld by HUD, which applied those funds to rent arrears.

Plaintiffs have drawn our attention to a substantial number of reported decisions from various state jurisdictions which have revolutionized the law of landlord-tenant relationships by adopting a theory that in every residential lease, absent a valid contrary agreement, there is an implied warranty of habitability.[4] The courts adopting this theory have tended to treat leases of residential property as both a conveyance of an interest in real property and as an agreement giving rise to a contractual relationship in which the landlord's and tenant's obligations are mutually dependent. Most of the adopting jurisdictions analyzed the basic rationale underlying the old common law rule absolving the lessor from all obligation to repair the leased premises in favor of the lessee assuming such an obligation during the term of the lease, and concluded that such a rule was never really intended to apply to urban residential leaseholds. *See: Javins v. First National Realty Corp.,* 138 U.S.App.D.C. 369, 428 F.2d 1071, 1080 (1970) *cert. denied,* 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970). Recognizing that the rule of decision governing this case must be federal, plaintiffs suggest that we

---

and projects, the Second Circuit relied on various provisions of URA alluding to that type of activity. *See: Caramico, supra,* 509 F.2d at 698.

**4.** E. g. *Pines v. Perssion,* 14 Wis.2d 590, 111 N.W.2d 409 (1961); *Jack Springs, Inc. v. Little,* 50 Ill.2d 351, 280 N.E.2d 208 (1972); *Old Town Development Company v. Langford,* 349 N.E.2d 744 (Ind.App.1976); *Javins v. First National Realty Corp.,* 138 U.S.App.D.C. 369, 428 F.2d 1071 (1970), *cert. denied,* 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970).

look to these state court decisions for guidance in developing a federal landlord-tenant law imposing a warranty of habitability in leases between federally owned low income housing projects and their tenants. *Cf. Illinois v. Milwaukee*, 406 U.S. 91, 107, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972).[5]

We decline plaintiffs' invitation to follow these state court decisions implying a warranty of habitability in urban residential leases in the private sector. We decline to do so because we are not persuaded that such warranties should be implied in leases of dwelling units constructed and operated as public housing projects. In contrast to housing projects in the private sector, the construction and operation of public housing are projects established to effectuate a stated national policy "to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income". 42 U.S.C. § 1401. As such, the implication of a warranty of habitability in leases pertaining to public housing units is a warranty that the stated objectives of national policy have been and are being met. We feel that the establishment of any such warranty that national policy goals have been attained or that those goals are being maintained is best left to that branch of government which established the objectives.

Plaintiffs further contend that the rationale of the various state court decisions implying the warranty in urban residential leases was advanced years ago by Congress when it enacted the United States Housing Act of 1937, 42 U.S.C. § 1401 *et seq.* Pointing to the Congressional declaration of national housing policy contained in 42 U.S.C. § 1441, the "comprehensive" regulatory scheme imposed on mortgagors of Section 221(d)(3) projects [6] and the various chapters of HUD's Property Disposition Handbook, Multifamily Properties, RHM 4315. 1 (February 17, 1971), plaintiffs argue that these multiple obligations upon HUD, its mortgagors, and management agents to make repairs and generally maintain public housing facilities in decent, safe, and sanitary conditions must implicitly run to the benefit of the tenant as an implied term in their leases. We reject this contention for reasons similar to our rejection of plaintiffs' suggestion that we follow state court decisions in implying a warranty of habitability.

The stated Congressional purpose of providing a "decent home and a suitable living environment for every American family," 42 U.S.C. § 1441, expresses general Congressional objectives in instituting public housing programs. We fail to see how these objectives can be interpreted to impose upon HUD or its agent an absolute, fixed obligation to maintain suitable dwellings. Moreover, like many declarations of Congressional policy, 42 U.S.C. § 1441 sets forth broad future objectives on a grand scale which are to be accomplished over a period of many years. The establishment of Congressional objectives, while certainly affording benefits to those eligible to partake of programs designed to attain those objectives, is not tantamount to a warranty that such objectives will be attained.

Accordingly, the judgment of the district court is affirmed.

AFFIRMED.

---

**5.** *Illinois v. Milwaukee, supra*, involved a federal common law of nuisance in a water pollution context. The Court indicated that a state's environmental quality standards are relevant but not conclusive sources of federal common law. *Cf. also: Textile Workers v. Lincoln Mills*, 353 U.S. 448, 456–457, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

**6.** Plaintiffs cite as examples of this "comprehensive" scheme 24 C.F.R. §§ 221.530(b), 221.545(c), and 221.529. We note that these sections pertain to the mortgagor's general duty to maintain facilities constructed under § 221(d)(3) programs in the context of a much more comprehensive financial scheme relating to federally insured mortgages.