Marie CONILLE, Plaintiff, Appellant,

v.

SECRETARY OF HOUSING AND URBAN DEVELOPMENT, et al., Defendants, Appellees.

No. 87–1120.

United States Court of Appeals, First Circuit.

Heard Sept. 15, 1987.

Decided Feb. 19, 1988.

Paul R. Collier, III, Boston, Mass., with whom Philip Buri, Harvard Legal Aid Bureau, was on brief for plaintiff, appellant.

Daniel S. Manning, Greater Boston Legal Services, Boston, Mass., on brief for Mrs. Charlie Dew, amicus curiae.

Robert K. Rasmussen, Appellate Staff, Civil Div., Dept. of Justice, with whom Michael Jay Singer, Appellate Staff, Civil Div., Dept. of Justice, Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Robert S. Mueller, III, U.S. Atty., Boston, Mass., Gershon M. Ratner, Associate General Counsel for Litigation, John W. Herold, Asst. General Counsel for Litigation, and Barry F. Smith, Office of General Counsel, Washington, D.C., were on brief for defendants, appellees.

Before COFFIN and ALDRICH, Circuit Judges, and LAGUEUX,* District Judge.

COFFIN, Circuit Judge.

The appellant, Marie Conille, is a former tenant of the Washington Apartments in Dorchester, Massachusetts, a housing

* Of the District of Rhode Island, sitting by designation.

project rehabilitated in the late 1960s with mortgage loans insured by the United States Department of Housing and Urban Development ("HUD"). During her tenancy, the owners of the Washington Apartments defaulted on their mortgage obligations. As a result, HUD took assignment of the mortgage and on May 10, 1982, became mortgagee in possession ("MIP") pursuant to section 1713(k) of the National Housing Act ("NHA"), 12 U.S.C. §§ 1701–1750g. In its capacity as MIP, HUD was responsible for all aspects of property management, including rent collection and property maintenance. *Conille v. Pierce*, 649 F.Supp. 1133, 1136, 1144 (D.Mass.1986). It hired an independent company, Interim Management, Inc., to manage the Washington Apartments.

On January 31, 1983, while HUD was serving as MIP, Conille and her family allegedly were forced to vacate the apartment due to its deteriorated condition.[1] She subsequently filed a complaint in the United States District Court for the District of Massachusetts against Samuel R. Pierce, in his capacity as Secretary of HUD, seeking to recover rent paid and compensatory damages for the period from May 10, 1982 to January 31, 1983. She claimed that the Secretary had breached an implied warranty of habitability and had infringed her right of quiet enjoyment under state and federal law.[2] The Secretary asserted affirmative defenses of sovereign immunity and federal preemption.

The parties submitted stipulated facts for a trial on the Secretary's affirmative defenses. The district court concluded that the Secretary had waived sovereign immunity and was therefore subject to Conille's suit for damages or restitution of rent. *Conille*, 649 F.Supp. at 1138.[3] It dismissed Conille's state law claims, however, on the ground that they conflicted with federal law embodied in the NHA. *Id.* at 1145–46. The court found that the Secretary had a "duty to take reasonable steps to maintain all HUD-owned or MIP projects in a decent, safe, and sanitary condition, and that such steps must include safeguards for the life, health, and safety of the tenants." *Id.* at 1145. Nevertheless, the court concluded that even if the Secretary had breached that duty in this case, Conille would not be entitled to either monetary damages or restitution of her rent because, notwithstanding the conditions of her apartment, *see supra* note 1, either remedy would be too "extraordinary" in the circumstances of this case. *Id.* at 1154. It therefore dismissed her action and entered judgment for the Secretary.

## I.

### *The Law to be Applied*

Conille argues that the district court erred in concluding that her state law

---

1. At the time HUD took over as MIP, the City of Boston Housing Inspection Department had prepared a complaint concerning Conille's apartment, stating that the front door, kitchen ceiling and wall, living room ceiling, and hall wall were not in good repair and that a bedroom ceiling was leaking. *Conille*, 649 F.Supp. at 1151. In June, 1982, Interim Management reported further damages to her apartment and the need for a new stove and refrigerator. *Id.* Photographs taken in October, 1982 show the lock for the front door missing, wall paper and paint peeling off walls and ceilings, a hole in the wall of the master bedroom, and water damage to the walls, floor, and cabinets of the kitchen. *Id.* at 1152. On January 31, 1983, the day Conille left her apartment, a professional "Home Inspector" reported, amongst other things, the existence of mice and cockroaches in the apartment, a missing baseboard and mouse hole by the base cabinet under the kitchen sink, and defective windows that would not lock properly. *Id.* Pictures taken the same day show a displaced threshold in the doorway between bedrooms, holes in the exterior porch, water stains on the ceiling in the master bedroom, paint on the bedroom floor, and patches of peeled paint on the living room ceiling. *Id.*

2. She also asserted claims against the Secretary for unfair and deceptive business practices under Mass.Gen.Laws Ann. ch. 93A, § 9 (West 1984); and for failure to return her security deposit pursuant to Mass.Gen.Laws Ann. ch. 186, § 15B(5) and (7) (West Supp.1987). In this appeal we address neither of these claims. The district court dismissed Conille's unfair and deceptive practices claim, and she does not contest that dismissal on appeal. She withdrew her claim relating to the Secretary's alleged retention of her security deposit before the district court entered judgment for the Secretary.

3. The Secretary does not contest this conclusion, and we find the district court's reasoning to be sound.

claims were preempted by provisions of the NHA. In the alternative, she contends that even if the district court correctly dismissed her state law claims, the same or similar rights and remedies are available to her as a matter of federal common law. The Secretary presents essentially two arguments for upholding the district court's judgment. First, he asserts that because this action calls into question the rights and obligations of the United States under a lease entered into pursuant to the NHA, uniquely federal interests are at stake, and federal law must be applied. Second, he argues that Congress has comprehensively addressed the issues presented in this case through the enactment of sections 203(a) and (c) of the Housing and Community Development Amendments of 1978, 12 U.S. C. § 1701z–11(a) and (c), and thereby left no room for federal courts to fashion federal common law in this area.

We approach the complicated issues raised in this appeal recognizing that the Supreme Court has found it necessary to develop federal common law only in "few and restricted" instances, *Wheeldin v. Wheeler*, 373 U.S. 647, 651, 83 S.Ct. 1441, 1444–45, 10 L.Ed.2d 605 (1963), "[w]hen Congress has not spoken to a particular issue ... and when there exists a 'significant conflict between some federal policy or interest and the use of state law.'" *Milwaukee v. Illinois*, 451 U.S. 304, 313, 101 S.Ct. 1784, 1790, 68 L.Ed.2d 114 (1981) (quoting *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966)).

### A.

We agree with the Secretary that federal law must be applied to a controversy concerning the rights or obligations of the United States under a lease entered into in furtherance of the national housing program.

4. *See* 12 U.S.C. § 1710(g) (power of Secretary to rent housing conveyed to him under the NHA).

5. By "federal common law" we mean rules of federal law fashioned by courts when the substance of that rule is not clearly suggested by a

■ Conille's action against the Secretary for breach of implied obligations underlying her lease is one that sounds in contract. *See Forman v. United States*, 767 F.2d 875, 879 n. 4 (Fed.Cir.1985); *Keydata Corp. v. United States*, 504 F.2d 1115, 1123 (Ct.Cl.1974); *see also Javins v. First National Realty Corp.*, 428 F.2d 1071, 1075 (D.C.Cir.1970). It is well established that cases involving the rights and obligations of the United States or one of its agents under a contract, entered into pursuant to authority conferred by federal statute, are governed by federal law. *See, e.g., Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981); *Miree v. DeKalb County*, 433 U.S. 25, 28–29, 97 S.Ct. 2490, 2493–94, 53 L.Ed.2d 557 (1977); *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973); *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 89 L.Ed. 838 (1943); *Krupp v. Federal Housing Administration*, 285 F.2d 833, 834 (1st Cir. 1961). Conille's action against the Secretary, involving alleged violations of implied rights under a lease, entered into pursuant to the NHA,[4] is such a case and therefore is governed by federal law.

*See Alexander v. United States Department of Housing and Urban Development*, 555 F.2d 166, 170–71 (7th Cir.1977), *aff'd on other grounds*, 441 U.S. 39, 99 S.Ct. 1572, 60 L.Ed.2d 28 (1979); *Girard Trust Co. v. United States*, 149 F.2d 872, 874 (3d Cir.1945); *Chase v. Theodore Mayer Bros.*, 592 F.Supp. 90, 97 (S.D.Ohio 1983). *See generally* Note, *Implied Warranty of Habitability in Federal Housing Projects: Alexander v. United States Department of Housing and Urban Development*, 19 B.C.L.Rev. 343, 348–49 (1978).

Stating that an issue is governed by federal law, however, does not open the door to the fashioning of federal common law by federal courts.[5] Federal common law, be-

federal enactment. *See generally* Field, *Sources of Law: The Scope of Federal Common Law*, 99 Harv.L.Rev. 881, 890–92 (1986); Merrill, *The Common Law Powers of Federal Courts*, 52 U.Chi.L.Rev. 1, 5–6 (1985).

ing "subject to the paramount authority of Congress," is resorted to only as a "necessary expedient" when federal courts are "compelled to consider federal questions which cannot be answered from federal statutes alone." *Milwaukee v. Illinois,* 451 U.S. at 313–14, 101 S.Ct. at 1791 (quotations and citations omitted).[6] Moreover, if there is no "significant conflict between some federal policy or interest and the use of state law," *id.* at 313, 101 S.Ct. at 1790, there is no need for a federal court to embark upon the unfamiliar road of common lawmaking, even in situations where the rights or obligations of the United States under a contract are at stake. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); *United States v. Yazell,* 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966).[7] Thus, in cases involving contractual obligations of the United States that are not addressed by statute, but resolvable under state law without any conflict with federal policy, state law is said to be "incorporated as the federal rule of decision." *United States v. Kimbell Foods, Inc.,* 440 U.S. at 728, 99 S.Ct. at 1458.[8]

The parties have addressed these considerations. Conille argues that we should incorporate Massachusetts landlord-tenant law as the federal rule in this case. The Secretary argues, on the other hand, that Congress has addressed, in a comprehensive way, the rights and obligations at issue in this case, leaving no room for our fashioning of federal common law, with or without the incorporation of state law. We think that neither party is fully correct. We address their arguments in reverse order.

### B.

The Secretary argues that 12 U.S.C. § 1701z–11 comprehensively covers the issues involved in this case, and that by enacting that statute, Congress left no room for judicial recognition of Conille's federal law claims.

Section 1701z–11 provides, in pertinent part:

(a) It is the policy of the United States that the Secretary of Housing and Urban Development ... shall manage and dispose of multifamily housing projects which are owned by the Secretary in a manner consistent with this chapter and this section. The purpose of the property management and disposition program

---

**6.** When Congress only indirectly or ambiguously addresses the questions presented in a controversy between parties, but they bear some relationship to a federal program, federal courts are constrained, in their fashioning of the rule of decision, to impose standards that are in accord with the purposes of that program. *See County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 237, 105 S.Ct. 1245, 1253, 84 L.Ed.2d 169 (1985) (interpreting *Milwaukee v. Illinois, supra,* and fashioning federal common law to resolve Indian tribe's property dispute consistently with Nonintercourse Act). In such instances, Congress can be said to have left an interstice to be filled by federal common law. *See United States v. Little Lake Misere Land Co.,* 412 U.S. at 593, 93 S.Ct. at 2397 ("the inevitable incompleteness presented by all legislation means that interstitial federal lawmaking is a basic responsibility of the federal courts"); *Miree v. DeKalb County,* 433 U.S. at 35, 97 S.Ct. at 2496 (Burger, C.J., concurring); *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *cf. Milwaukee v. Illinois,* 451 U.S. at 320, 324 n. 18, 101 S.Ct. at 1796 n. 18 (where permits issued under the Clean Water Act control the discharge of treated sewage into interstate waters, there exists no "interstice" in the legislation for federal courts to impose more stringent standards as a matter of federal common law).

**7.** If there is a need for a uniform federal rule, yet certain issues in the controversy can be resolved according to principles of state law without compromising federal purposes underlying a national program, a federal court may incorporate those non-conflicting state laws into the federal rule. *Textile Workers v. Lincoln Mills,* 353 U.S. at 457, 77 S.Ct. at 918. *See Board of Commissioners v. United States,* 308 U.S. 343, 351–52, 60 S.Ct. 285, 288–89, 84 L.Ed. 313 (1939). *See generally* Field, *supra,* note 5, at 888, 983 (in fashioning federal law, judiciary has power to choose and apply mixture of state and federal law).

**8.** We note that while courts in this context are not, strictly speaking, making federal common law, state law is adopted and applied as a matter of "'federal common law' or 'law of independent federal judicial decision.'" *See United States v. Standard Oil Co.,* 332 U.S. 301, 307–10, 67 S.Ct. 1604, 1608, 91 L.Ed. 2067 (1947); *see also Little Lake Misere,* 412 U.S. at 593, 93 S.Ct. at 2397.

of the Department of Housing and Urban Development shall be to manage and dispose of projects in a manner which will protect the financial interests of the Federal Government and be less costly to the Federal Government than other reasonable alternatives by which the Secretary can further the goals of—

(1) preserving the housing units so that they can remain available to and affordable by low- and moderate-income families;

(2) preserving and revitalizing residential neighborhoods;

(3) maintaining the existing housing stock in a decent, safe, and sanitary condition;

(4) minimizing the involuntary displacement of tenants; and

(5) minimizing the need to demolish projects.

The Secretary, in determining the manner by which a project shall be managed or disposed of, may balance competing goals relating to individual projects in a manner which will further the achievement of the overall purpose of this section.

.    .    .    .    .

(c) Except where the Secretary has determined on a case-by-case basis that it would be clearly inappropriate, given the manner by which an individual project is to be managed or disposed of pursuant to subsection (a) of this section, the Secretary shall seek to—

(1) maintain all occupied multifamily housing projects owned by the Secretary in a decent, safe, and sanitary condition; and

(2) to the greatest extent possible, maintain full occupancy in all multifamily housing projects owned by the Secretary.

These provisions set forth national policy goals to be pursued by the Secretary as well as his obligations to maintain properties and keep them occupied when they come into HUD ownership.[9]  H.Conf.Rep. No. 1792, 95th Cong., 2d Sess. 67–69, re-

*printed in* 1978 U.S.Code Cong. & Admin. News 4773, 4872, 4887–89.  By enacting these provisions, Congress did not purport, in any way, to regulate contractual relations between the Secretary, as landlord, and his tenants under HUD leases.  While there are specific limitations placed upon the Secretary's maintenance obligations in managing and disposing of HUD-owned housing, rudimentary matters underlying landlord-tenant relations such as obligations to pay rent, subleasing, and evictions are not addressed in this or any other provision of the NHA.  The NHA might loosely be described as governing "housing" matters, leaving untouched the area of landlord-tenant law that typically has been the province of state courts and legislatures.  *Cf. Kargman v. Sullivan*, 552 F.2d 2 (1st Cir.1977) (Boston rent control ordinance not preempted by NHA).  While Congress has made public policy regarding public housing, generally, it has not sought to legislate in the area of mutual obligations between parties to modern tenancy agreements.

■  Thus, Conille's case, focusing specifically on a landlord's obligation to its tenant, does not present a situation where Congress has comprehensively occupied a field and thereby displaced or preempted a judicially-fashioned federal rule.  *Cf. Milwaukee v. Illinois*, 451 U.S. at 317–32, 101 S.Ct. at 1792–1800 (Clean Water Act precludes federal common law public nuisance action for interstate water pollution because it comprehensively addresses federal water pollution and provides remedial scheme for statutory violations); *Northwest Airlines, Inc. v. Transportation Workers*, 451 U.S. 77, 95–98, 101 S.Ct. 1571, 1582–84, 67 L.Ed.2d 750 (1981) (Equal Pay Act and Title VII of Civil Rights Act is comprehensive legislative scheme with integrated system of procedures for enforcement that precludes court from fashioning federal common law right of contribution).  Rather, this case, involving a dispute over the obligations of the United States as a party to a lease and no comprehensive leg-

---

9. Although this section addresses only HUD-owned properties, the parties concede that it also applies to properties operated by the Secretary as MIP.

islative scheme or enforcement mechanism addressing the particular matters at issue, presents one of those instances in which a federal court is compelled to fashion the applicable federal rule of decision. *See, e.g., County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 236–40, 105 S.Ct. 1245, 1252–54, 84 L.Ed.2d 169 (1985); *United States v. Little Lake Misere Land Co., Inc.,* 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973); *Illinois v. City of Milwaukee,* 406 U.S. 91 (1972); *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).[10]

### C.

■■■ Relying upon *United States v. Kimbell Foods,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979),[11] Conille argues that we should simply incorporate Massachusetts landlord-tenant law as the federal rule of decision, including its implied warranty of habitability and the implied covenant of quiet enjoyment. We conclude that

we cannot adopt Massachusetts law because certain congressional purposes underlying the NHA would be frustrated if we were to do so.

Under the NHA, the Secretary may make a finding, pursuant to section 1701z–11(c), that it is "clearly inappropriate" to seek to maintain a premises in "decent, safe, and sanitary condition." In the absence of such a finding, which was not made in this case, section 1701z–11(c) provides only that the Secretary *shall seek* to ... maintain all occupied multifamily housing projects" owned by him or operated by him as MIP in a decent, safe, and sanitary condition. *Id.* (emphasis added). By choosing the words "shall seek" rather than "shall," Congress clearly intended to require only that the Secretary take reasonable, affirmative steps toward maintaining housing projects under his ownership or control in decent, safe, and sanitary condition. The plain meaning of the words

---

**10.** We take note of the suggestion, urged upon us by the Secretary for the first time at oral argument, that Conille is claiming a private right of action under the NHA and that under *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed. 2d 26 (1975), no such private right exists. The Secretary bases this argument on the assertion that Conille fails to allege in her complaint that he breached the terms of the lease agreement.

Failure, however, to allege breach of a specific term of the lease does not place Conille in the posture of basing her right on the NHA. For her complaint alleges that the Secretary breached an implied warranty of habitability as a matter of "federal common law" and that he breached her right of quiet enjoyment as a matter of "federal law." We also note that her lease agreement with the Secretary, which provides, "It is ... agreed that the LANDLORD will make all necessary repairs to [the] property except repairs necessary to be made caused by the acts or neglect of the TENANT," was received into evidence, and the district court treated her claims as based upon implied obligations in her HUD lease. *See Conille,* 649 F.Supp. at 1140. If Conille had asserted in her complaint, at trial, or on appeal that her alleged rights and remedies in this case were grounded in the NHA, we would apply the standard articulated in *Cort* and its progeny to determine whether a private right of action can be implied from the statute. That not being the case, however, we treat her claims as they are presented to us: as derived from principles of federal common law governing the contractual relationship she had with the Secretary as his tenant, not "implied" from a

specific statutory source. *See Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. at 638, 101 S.Ct. at 2065–66 (distinguishing between analysis of right of action as a matter of federal common law and as implied from a specific statute); *Northwest Airlines, Inc. v. Transport Workers,* 451 U.S. at 86, 101 S.Ct. at 1577–78 (same). *Cf. Miree v. DeKalb County,* 433 U.S. at 33–34, 97 S.Ct. at 2495–96 (refusal to address assertion of private right of action implied from statute when recovery sought only on the basis of negligence, nuisance, and breach of contract).

**11.** In *Kimbell Foods,* the Supreme Court established that in the absence of a rule provided by congressional enactment, courts should consider three factors in deciding whether to adopt state law as the rule of decision: the need for a uniform body of federal law, the likelihood that the disparate application of state laws would frustrate specific objectives of the federal program, and the extent to which application of a federal rule would disrupt commercial relationships predicated on state law. *Kimbell Foods,* 440 U.S. at 728–29, 99 S.Ct. at 1458–59; *see Chicago Title Insurance Co. v. Sherred Village Associates,* 708 F.2d 804, 810 (1st Cir.1983). Applying those factors, the Supreme Court held that in the absence of a congressional enactment addressing priority rules for contractual liens arising out of certain federal loan programs, nondiscriminatory state laws would apply to the United States as they would to private creditors.

"shall seek" leaves no other reasonable interpretation of the congressional intent.[12]

This maintenance obligation is narrower in scope than the duties that would be imposed upon the Secretary as a private landlord under the Massachusetts implied warranty of habitability and covenant of quiet enjoyment. Under those laws, landlords may be held liable to tenants even if they "seek" to maintain properties in habitable conditions, *see Boston Housing Authority v. Hemingway*, 363 Mass. 184, 199, 293 N.E.2d 831 (1973) ("in a rental of any premises for dwelling purposes, under written or oral lease, for a specified time or at will, there is an implied warranty that the premises are fit for human occupation"), or "seek" to avoid the impairment of the character or value of properties, *see Simon v. Solomon*, 385 Mass. 91, 102, 431 N.E.2d 556 (1982) (construing requirements of Massachusetts statutory implied covenant of quiet enjoyment). Affirmative steps of private landlords toward meeting their obligations to tenants under these Massachusetts laws would not suffice to stave off liability. *See id.; Hemingway*, 363 Mass. at 199, 293 N.E.2d 831. Thus, the incorporation of Massachusetts landlord-tenant laws would frustrate Congress's specific objectives in imposing a narrower maintenance obligation upon the Secretary in his capacity as MIP of HUD housing.

In addition, Massachusetts's statutory implied covenant of quiet enjoyment is in-consistent with the NHA insofar as it allows a tenant to recover consequential damages from a "landlord who directly or indirectly interferes with the quiet enjoyment of any residential premises by the occupant." Mass.Gen.Laws Ann. ch. 186 § 14 (West Supp.1987). *See Simon v. Solomon*, 385 Mass. 91, 102, 431 N.E.2d 556 (1982). In rejecting Conille's claim to a damages remedy, the district court stated:

> Although basic fairness mandates some recourse to equity, the reflex provision as of right to consequential money damages is a wholly different question. That course would be a far-reaching step with unpredictable, and not necessarily beneficial results overall even in its impact on HUD's ultimate discharge of housing assistance responsibilities, delegated by Congress with some necessary discretion meriting recognition. There just appears no convincing reason to adopt that approach.

*Conille*, 649 F.Supp. at 1149.

We agree. The imposition of consequential damages upon the Secretary in this case could potentially impede the realization of the overall purpose of the NHA: the upgrading of national housing. That purpose is achieved through federal spending in a variety of ways, including rental subsidies for new or rehabilitated housing, mortgage insurance, and funding for urban renewal. To impose upon the Secretary a

---

**12.** Conille argues that the legislative history draws into question the congressional intent behind the choice of words "shall seek." The provision in the original Senate bill for what eventually became section 1701z-11(c) provided: "The Secretary *shall* maintain all occupied multifamily housing projects owned by the Secretary in a decent, safe, and sanitary condition." Senate Bill 3084 reported May 15, 1978 (emphasis added). The House Conference Report describes the changes made to section 1701z-11(c) before final enactment as follows:

> The Senate bill contained a provision not in the House amendment which provided that the Secretary shall maintain all occupied, HUD-owned mulifamily projects in a decent, safe and sanitary condition, and that the Secretary maintain full occupancy in such projects.
>
> The conference report contains these two provisions, but provides an exception to these obligations where the Secretary has deter-mined on a case-by-case basis that such policies would be clearly inappropriate given the manner in which the Secretary has determined an individual project will be managed or disposed of pursuant to the goals of this section.

H.Conf.Rep. No. 1792, 95th Cong., 2d Sess. 69, *reprinted in* 1978 U.S.Code Cong. & Admin. News 4872, 4889. We agree that this legislative history renders the congressional purpose underlying the use of the words "shall seek" somewhat ambiguous. We resolve that ambiguity, however, with the presumption that, absent a clearly expressed legislative intent to the contrary, Congress intended the words *"shall* seek" to be interpreted according to their ordinary meaning. *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1980). The legislative history cited by Conille is not a clearly expressed congressional intent that "shall seek" means "shall."

consequential damages penalty for breaching duties implied under leases with his tenants would expose the federal government to unpredictable costs. This would frustrate Congress's considered judgment to allocate scarce financial resources to improve the overall quality of the nation's housing stock. We therefore cannot impose a damages remedy against the Secretary under Massachusetts law without interfering with federal purposes underlying the national housing program.[13]

Thus, unlike the situation in *Kimbell Foods* and its progeny, we cannot incorporate Massachusetts law as the federal rule governing this case. Nevertheless, Conille is not without a remedy. As we set forth below, we recognize and give force to rights favoring Conille that derive from obligations owed to her by the Secretary by virtue of contractual obligations inherent in their landlord-tenant relationship. Moreover, we recognize that while Massachusetts's, or any state's, particular law may run afoul of general limitations placed upon the Secretary's maintenance obligations under section 1701z–11, state law, in general, must be our starting point in fashioning a federal rule governing this case. Landlord-tenant relationships have long been governed by state common or statutory law, and it would be inefficient for us to begin writing on a clean slate. It also would be presumptuous, since states' interests in regulating the relations of landlord and tenant militate against the wholesale displacement of those laws by federal courts. *See United States v. Little Lake Misere Land Co.*, 412 U.S. at 591, 93 S.Ct. at 2396 (the great body of law in this country which defines the rights of property owners in relation to private parties is found in the statutes and decisions of the states).

■ In the same manner that Congress has not precluded our fashioning of a federal common law rule in this area, it has not precluded our selective incorporation of state laws into that rule to the extent that they can be applied consistently with, or in furtherance of, the underlying purposes of the NHA. *See supra* note 7; *see also United States v. Standard Oil Co.*, 332 U.S. 301, 309, 67 S.Ct. 1604, 1609, 91 L.Ed. 2067 (1947) (in some situations "it may fairly be taken that Congress has consented to application of state law, when acting partially in relation to federal interests and functions, through failure to make other provision concerning matters ordinarily so governed"); *cf. Powers v. United States Postal Service*, 671 F.2d 1041 (7th Cir.1982) (where a federal regulatory scheme was not affected, court applied state landlord-tenant law in landlord's action against U.S. Postal Service); *Merrill Tenant Council v. United States Department of Housing and Urban Development*, 638 F.2d 1086 (7th Cir.1981) (incorporating Illinois statute requiring landlord to pay interest on tenants' security deposits into tenants' leases with HUD). We therefore conclude that the federal and state interests here involved, as well as those of the individual tenant, can best be served by a federal rule that upholds the general force of state laws in this controversy in a manner consistent with the NHA. We turn now to the substance of that rule.

## II.

### Conille's Rights and Remedies

■ Conille seeks, as a matter of federal common law, the restitution of her rental payments (or a portion thereof) from the Secretary during the period in which he breached his obligation to maintain her apartment in a habitable condition. This remedy, derived from established principles of federal common law and state landlord-tenant law, can be enforced against the Secretary in a manner consistent with the NHA.

---

13. While we agree with our own district court on this issue, we also find helpful the reasoning of other courts that have approached this issue, albeit, from slightly different angles. *See Chase v. Theodore Mayer Bros.*, 592 F.Supp. at 97–98; *see also Mann v. Pierce*, 803 F.2d 1552, 1557–58

(11th Cir.1986) (holding that Secretary's sovereign immunity defense to tenants' claim for damages for breach of implied warranty of habitability does not bar tenants' right to seek restitution, but leaving open question whether consequential damages available).

In *Krupp v. Federal Housing Administration*, 285 F.2d 833 (1st Cir.1961), we recognized and upheld a contract claim against the Federal Housing Authority (FHA), HUD's predecessor agency, concluding that the FHA's liability on a contract "must be decided in the same manner as that of a private party in the same circumstances." *Id.* at 834. We have interpreted the Supreme Court's decision in *Federal Housing Administration v. Burr*, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940), our decision in *Krupp*, and other cases in which private parties have maintained actions against the Secretary for contract violations, as holding, in essence, that "the Secretary may be sued on a contract made by him by ... any person having direct contractual relations with the Secretary on a claim derived from the contract." *Armor Elevator Co. v. Phoenix Urban Corp.*, 655 F.2d 19, 21 (1st Cir.1981). Other federal courts have found, in a variety of contexts, that parties have enforceable contract rights, expressed or implied, against the Secretary, as a matter of federal common law. *E.g., Holbrook v. Pitt*, 643 F.2d 1261, 1270 (7th Cir.1981); *S.S. Silberblatt, Inc. v. East Harlem Pilot Block*, 608 F.2d 28, 36–37 (2d Cir.1979); *Trans–Bay Engineers & Builders, Inc. v. Hills*, 551 F.2d 370, 377–78 (D.C.Cir.1976); *Philadelphia v. Page*, 363 F.Supp. 148, 153–54 (E.D. Pa.1973); *see also Alvin, Ltd. v. United States Postal Service*, 816 F.2d 1562 (Fed. Cir.1987) (contract action against U.S. Postal Service pursuant to lease agreement); *Forman v. United States*, 767 F.2d 875 (Fed.Cir.1985) (same).

We conclude that Conille, as a party to a leasehold agreement with the Secretary, has such rights in this case. Her specific asserted right to obtain restitution of rent for the Secretary's breach of an implied obligation to maintain her apartment is one premised upon the most basic of contract principles: tenants should not be forced to pay for something for which they contracted, but did not receive.[14] A tenant's duty to pay rent to a landlord is predicated upon the landlord's provision of the subject premises in a livable condition. *See generally Javins v. First National Realty Corp.*, 428 F.2d 1071, 1082 (D.C.Cir.1970); *Boston Housing Authority v. Hemingway*, 363 Mass. at 198, 293 N.E.2d 831; Annotation, *Modern Status of Rules as to Existence of Implied Warranty of Habiblity or Fitness for Use of Leased Premises*, 40 A.L.R.3d 646, 657–58 (1971). A majority of states enforce the landlord's side of this mutual obligation through the "warranty of habitability." *See generally* 2 R. Powell, *The Law of Real Property* at 17A–3– 17A–4 & n. 1, 17A–12 n. 29 (1986); 1 *Tiffany Real Property* § 99 (3d ed. 1987 Supp.); *Restatement (Second) of Property*, ch. 5, statutory notes 1, 3 (1977). What the warranty means, in practice, is that if a landlord brings an eviction proceeding against one of his tenants for failure to pay rent, that tenant may raise, as an affirmative defense, the landlord's failure to maintain the subject property in a habitable condition. *See generally* 1 *Tiffany Real Property* § 99 (3d ed. 1987 Supp.); *Restatement (Second) of Property*, ch. 5, statutory note 3g; *Hemingway* at 202, 293 N.E.2d 831. Alternatively, and of particular significance to Conille, a tenant may pay rent when due under protest and then bring an action against the landlord to recover that part owed by the landlord, in restitution, due to his failure properly to maintain the premises. *See generally* 1 *Tiffany Real Property* § 99 (3d ed. 1987 Supp.); *Restatement (Second) of Property*, ch. 5, statutory note 3g; *Hemingway* at 203 n. 20, 293 N.E.2d 831.

It seems to us that these established principles of mutual obligation underlying

---

**14.** We have pointed out, *supra* note 10, that Conille's lease with the Secretary provided that he would make "all necessary repairs" to her apartment except those for which she was responsible. Absent from the lease is any specification of what constitutes "necessary" repairs or what rights or remedies Conille would have in the event that the Secretary failed to make such repairs. But this is not fatal. We define the mutual obligations underlying the landlord-tenant relationship between the Secretary and Conille according to accepted contract principles operating in most states through the implied warranty of habitability, modified in accordance with statutory limitations placed upon the Secretary's general maintenance obligations.

modern landlord-tenant relations and embodied in the "implied warranty of habitability" now recognized in the majority of states lead to an enforceable, if limited, right on the part of Conille against the Secretary. We therefore resolve the controversy before us in a manner that appears to be most consistent with the remedies afforded by that warranty.

The scope of any such remedy is constrained, however, by the limitations placed on the Secretary's general maintenance obligations under section 1701z–11(a) and (c): in the absence of a "clearly inappropriate" finding, he need only "seek to maintain" HUD owned or MIP properties in decent, safe, and sanitary condition. *See supra* at pp. 112–13. Congress's delineation of the Secretary's general maintenance obligations under those sections, therefore, narrows the category of acts or omissions that would constitute a breach and give rise to such a remedy. We cannot impose implied maintenance duties upon the Secretary that are more stringent than those otherwise required under national housing legislation. *See supra* note 6. Accordingly, we modify the remedy to make it fully consistent with the NHA.[15]

Congress has made it clear that the overall purpose of the NHA is to provide "a *decent* home and a *suitable* living environment for every American family." 12 U.S.C. § 1701t (quoting 42 U.S.C. § 1441) (emphasis added). *See* 42 U.S.C. § 1441a. These goals are incorporated directly into section 1701z–11, which requires the Secretary to manage and dispose of multifamily housing projects owned by him, or under his control as MIP, "in a manner consistent with this chapter." He must further the goal of "maintaining the existing housing stock in a decent, safe, and sanitary condition." 12 U.S.C. § 1701z–11(a)(3). While Congress was unwilling to guarantee that in every instance, the Secretary will maintain MIP projects in decent, safe, and sanitary condition for his tenants, it has declared that unless the Secretary makes a finding that it is clearly inappropriate for him to do so, he must take reasonable steps toward so maintaining those properties. The district court concluded, and we agree, that, given the overall purposes of the NHA, Congress intended this to include, at a minimum, the removal of hazards to life, health and safety. *Conille*, 649 F.Supp. at 1147, 1151, 1154. This seems to us the proper basis for a modified "implied war-

---

**15.** The Secretary mistakenly relies on *Alexander v. United States Department of Housing and Urban Development*, 555 F.2d 166 (7th Cir.1977) to support his argument that we may not fashion a federal common law implied warranty of habitability. In that case, the Seventh Circuit declined to follow Indiana's implied warranty of habitability that tenants contended was implied in their leases with HUD; the court concluded that "implication of a warranty of habitability in leases pertaining to public housing units is a warranty that the stated objectives of national policy have been and are being met." *Id.* at 171. The court chose to defer to Congress on that policy determination.

We disagree with the Seventh Circuit's opinion that implying a contractual obligation upon the Secretary to maintain HUD housing is a guarantee that national housing goals are being met. *See generally* Note, *Implied Warranty of Habitability in Federal Housing Projects: Alexander v. United States Housing and Urban Development*, 19 B.C.L.Rev. 343, 358 (1978) (such a warranty is, rather, "a warranty that the housing that is provided by the government will meet minimum standards of habitability.")

More importantly, we find *Alexander* distinguishable from the case before us because it

was decided prior to the enactment of the Housing and Community Development Amendments of 1978. As we have pointed out, in section 1701z–11, which was enacted as part of those amendments, Congress set forth the Secretary's general maintenance obligations while managing or disposing of HUD projects falling into his ownership or control as MIP. In enacting the provision which eventually became section 1701z–11(c), the Senate was influenced by testimony before the Banking, Housing, and Urban Affairs Committee "that many projects have actually deteriorated during the periods of HUD ownership and that HUD has been unresponsive in many cases to the need for adequate maintenance of HUD-owned properties." S.Rep. No. 871, 95th Cong., 2d Sess. 23, *reprinted in* 1978 U.S.Code Cong. & Admin.News 4773, 4796. Unlike the Seventh Circuit, we have the opportunity to construe that statute and build the policies articulated therein into the federal common law rule for this case.

We impose no obligation upon the Secretary more stringent than that outlined by Congress in section 1701z–11, and we do so in furtherance of purposes underlying that statute and the overall legislative scheme of which it is a part.

ranty of habitability" in this case, being fully consistent with federal interests underlying the national housing program. Indeed, as we note below, a lack of any remedy in cases such as this would seem to render superfluous the specific statutory escape hatch given by Congress to the Secretary to gain relief from any maintenance obligation.

█ The substance of this implied and limited warranty of habitability we define as follows: upon being notified that a particular property under lease to a tenant is not in "decent, safe, and sanitary" condition due to no fault of the tenant, the Secretary must take reasonable, affirmative steps toward making the necessary repairs that will put the property in that condition. What shall constitute "reasonable, affirmative steps" will vary according to the severity of the conditions of the premises.[16]

█ Thus, for Conille to establish that the Secretary breached his obligation to properly maintain her apartment she will be required to prove that he failed to take reasonable, affirmative steps to keep the premises in "decent, safe, and sanitary condition." A showing that her premises were not in those conditions, by itself, will not be sufficient to prove the breach. She must demonstrate that the Secretary, while on notice of those conditions, failed to take reasonable, affirmative steps to correct them. Upon establishing such a breach, Conille would then be entitled to the restitution of rental payments made during the period of the breach, representing the difference between the value of the premises in a "decent, safe, and sanitary" condition (the rent she agreed to pay) and the value of the premises in their deteriorated condition. To determine whether the premises were in "decent, safe, and sanitary" condition the district court should look to the

state and local housing laws in Massachusetts that would govern private landlord-tenant disputes.[17] *Cf. Chase v. Theodore Mayer Bros.*, 592 F.Supp. at 101 (looking to requirements of Ohio building, housing and safety codes which materially affect health and safety in context of tenant's "implied warranty of habitability" action against HUD).

That such a minimal right of restitution seems sensible in light of the statutory scheme is demonstrated by pursuing the Secretary's argument that the only relief consistent with section 1701z–11(c) would be injunctive relief.

The Secretary's general maintenance obligations under section 1701z–11(c) would essentially be meaningless if the only remedy available to tenants suffering from seriously deteriorating housing were injunctive relief. For as soon as a tenant filed for injunctive relief, the Secretary could avoid his obligation to respond by making his "clearly inappropriate" finding. Even if such a finding were, on review, to be held invalid, the passage of time would leave tenants in defective housing without relief. The remedy we have defined in effect allows tenants to obtain restitution of rental payments when they have endured the consequences of the Secretary's failure to maintain housing projects in accordance with section 1701z–11(c). This provides some assurance that when the Secretary has not made a "clearly inappropriate" finding, he will meet the obligations Congress intended him to fulfill under section 1701z–11(c).

*The judgment of the district court is vacated. The case is remanded for further proceedings consistent with this opinion. Costs to appellant.*

---

16. The Secretary's own policies and regulations provide for immediate repairs when the conditions of leased properties present immediate threats to health or safety. 24 C.F.R. § 290.16(d). Indeed, the district court recognized that during the Secretary's control of a particular property as MIP, cost considerations need not obstruct the Secretary from acting to

make repairs "to protect life, health, and safety." *Conille,* 649 F.Supp. at 1145.

17. We note that the Secretary's own regulations require him to maintain MIP properties "in compliance with State and local property management licensing requirements." 24 C.F. R. § 290.13(a)(1)(ix).