**Tyree FORD, a minor, by and through his parent and guardian, Louise PRINGLE**

v.

**PHILADELPHIA HOUSING AUTHORITY, Appellant.**

Commonwealth Court of Pennsylvania.

Argued March 2, 2004.

Decided March 29, 2004.

Reargument En Banc Denied June 3, 2004.

Susan J. French, Philadelphia, for appellant.

David J. Alexander, Philadelphia, for appellee.

BEFORE: PELLEGRINI, Judge, and SIMPSON, Judge, and KELLEY, Senior Judge.

OPINION BY Judge PELLEGRINI.

The Philadelphia Housing Authority (Authority) appeals from an order of the Court of Common Pleas of Philadelphia County (trial court) entering judgment in favor of Tyree Ford (Ford) by and through his mother, Louise Pringle (Pringle), on his claims that it was negligent and breached the implied warranty of habitability at their public housing rental property, 2114 Taney Terrace, by allowing lead-based paint to exist which Ford ingested causing him to suffer from lead poisoning and brain damage.

Pringle began leasing the Authority residence on November 19, 1990, prior to the birth of Ford and remained there with her children until November 16, 1994, when the Authority relocated them to another residence that was free of lead-based paint. Due to Ford's ingestion of lead-based paint at the Authority's rental property, Ford, who was born in 1991, was found to have suffered from lead poisoning, and after undergoing testing in early 1999, it was determined that he suffered brain damage. Consequently, it was not until October 20, 1999, when Ford was eight years old, that Pringle filed a complaint[1] against the Authority on Ford's behalf alleging the following:

1. Pringle filed a 15–count complaint against the Authority alleging the following causes of action:

Count I: Negligence and non-compliance
Count II: Implied Warranty of Habitability
Count III: Intentional Infliction of Emotional Distress
Count IV: Negligent Infliction of Emotional Distress
Count V: Unfair Trade Practices and Violations of the
Consumer Protection Law
Count VI: Strict Liability
Count VII: Ultrahazardous Activity
Count VIII: Third Party Beneficiary, Implied Rights of Action
Count IX: 42 U.S.C. Section 1983
Count X: Violation of PHA HUD Annual Contributions Contract

● Ford resided at 2114 Taney Terrace, a property that was owned by the Authority;

● from 1992 through 1995, he was tested and suffered from elevated blood levels as a result of ingesting lead-based paint at the Taney Terrace residence from 1992 through 1994;

● as a result, he suffered injuries consisting of neurological brain damage, diminished IQ, hyperactivity, loss in appetite, poor behavior, excitability and attention deficits.

The complaint further alleged that due to his ingestion of the lead-based paint, Ford had undergone medical care, would have to undergo chelation therapy,[2] and would, in the future, suffer from "insidious and progressively severe disability, mental and physical anguish, dysfunction of the mind and body, great expenses, loss of income and loss of power to earn." (Complaint at 5.) In response, the Authority filed both an answer denying the allegations and a cross-claim alleging contributory negligence.

In order to prove negligence (Count I of the complaint)[3] and breach of an implied warranty of habitability (Count II of the complaint), at the bench trial,[4] Pringle first

---

Count XI:  Loss of Consortium
Count XII:  Punitive Damages
Count XIII:  Violation of Residential Lead Based Paint Hazard Reduction Act Of 1992
Count XIV:  Violation of Phila.  Code § 6–403(5)
Count XV:  Violation of Phila.  Code §§ 6–801–6–813

The Authority filed preliminary objections to all of the counts.  The trial court granted the objections to Counts III VIII, XI, XII, XIV and XV. At trial, the remaining counts for consideration were Count I, II, IX, X and XIII. Because Counts IX, X and XIII were ultimately dismissed by the trial court and are not at issue on appeal, we will not address the evidence presented relative to those counts.

2.  "Chelation is a treatment where a child is given a drug called Succimer or Chemet that has the capability of removing lead in the blood stream ... [C]helation does not cure the body from the damage caused by lead but rather removes the lead from the blood to mitigate some of the damage it would cause to the internal organs." (Trial court's September 10, 2003 opinion at 8.) Ford was admitted to Hahnemann University Hospital in October of 1994 for five days to begin a 17–day course of chelation therapy to reduce the lead in his blood.

3.  Count I of the complaint alleged, in relevant part, the following:

The Authority was negligent and liable in its ownership, operation, maintenance and care of the premises at 2114 Taney Terrace by:
● Allowing a dangerous and harmful condition to exist;
● Failing to warn the plaintiffs of the dangerous and harmful conditions; renting a property that was unfit and unsafe for human habitation and which violated an implied warranty of habitability;
● Failing to correct the dangerous and harmful condition; and
● Failing to inspect for the dangerous and harmful conditions.

4.  Count II of the complaint alleged, in relevant part:
● The Authority was in receipt of rental payments paid by Pringle.
● The payments represent excessive amounts paid to the Authority and due back to her in light of the violations of the implied warranty of habitability of the property.
● Therefore, the entire rental payments made to the Authority are due back to Pringle.
● The Authority was advised of its past and continued violation and despite actual and/or constructive notices, it failed to adequately repair or remove the dangerous condition as required by the implied warranty of habitability.
● By supplying Pringle with a property covered with lead-based paint, the Authority has breached and continues to breach the implied warranty of habitability which was extended to Pringle by virtue of a lease agreement.

testified regarding the rental property. She stated that prior to moving into the property, she was unaware of the effects of lead-based paint on children, and that the Authority did not inform her or provide her with any information about lead-based paint and the effects of lead on children. She further stated that during the time she lived at 2114 Taney Terrace up until the time Ford went into the hospital in October of 1994, she never received any information or literature from the Authority regarding lead-based paint. Pringle testified that the Authority inspected the rental property annually and filled out inspection forms when she complained of chipping paint, but the Authority never came out and painted the property any time during the four years she lived there. However, Pringle stated that just before Ford was hospitalized in October of 1994 for his chelation therapy, she requested and received lead-free paint so that she could paint the walls of the downstairs area of her home where the paint was cracking.

To further prove that the Authority was aware that her residence had lead-based paint that was chipping but did nothing to remove it, she presented the testimony of Dennis Glancey (Glancey), who had worked for the Authority for 22 years until he retired in 1996. He stated that the last position he held with the Authority was Director of the Environmental Services Department for 18 months where he was responsible for identifying and doing whatever had to be done to remediate environmental concerns such as lead-based paint. (January 27, 2003 hearing transcript at 149.) Glancey stated that prior to his employment with the Authority, the Authority was made aware in 1971 that a regulation had been issued for public housing authorities to test for and abate lead-based paint on chewable surfaces on the inside of their units. (January 27, 2003

hearing transcript at 198.) He then identified an Authority document that Pringle offered into evidence dated March 7, 1974, indicating that 2114 Taney Terrace required lead-based paint removal from numerous locations inside the unit. Additionally, he identified documents from an April 19 and 25, 1990 interview and home visit by Authority personnel to the Taney Terrace address, which did not indicate that the Authority personnel advised Pringle of the lead-based paint in the rental property; and the Authority's lease agreement with Pringle which did not say anything regarding lead-based paint, but did require the lessee to have children in order to lease the unit and stated that the Authority was required to maintain the dwelling in compliance with the applicable laws, rules and regulations. Although Glancey stated that in 1991, the Authority sent to every resident in one of its units a letter explaining the threat lead-based paint posed to children, the precautions to take to avoid poisoning, and the symptoms of poisoning and what could be done about it, the only document offered into evidence showed that Pringle had received a letter and signed it indicating her receipt on November 17, 1994, after Ford had been diagnosed with lead poisoning. Finally, Glancey testified that Pringle's unit should have been inspected annually and an inspection report should have been generated, but he did not recall seeing such a report for any year that she lived there and particularly not for 1991.

Pringle then offered into evidence a written report dated October 14, 1994, authored by John Peduto (Peduto), the Authority's Lead Based Paint Coordinator, which was sent to the Authority's senior legal counsel, Denise Baker, stating the following:

Attached herewith is the Lead Based Paint report on 2114 Taney Terrace,

Unit # 130408 (Wilson Park). The report shows that there are many components with a high reading of lead inside and outside of the residence.

The child in question has an EBL (elevated blood level) of 55.

Following are the recommendations that the Philadelphia Housing Authority should follow:

1) Full abatement must be completed within 14 days after positive testing, or;

2) Transfer the tenants into a lead free unit immediately.

Pringle also offered into evidence a letter she received from the Authority dated November 4, 1994, stating that the Authority had tested the painted surfaces for lead-based paint in her unit and had confirmed the presence of lead. She stated that the Authority then offered to move her to another unit that was lead free, which she accepted, and she and her family moved on November 16, 1994.

To next prove that Ford suffered from lead poisoning as a result of ingesting lead-based paint, Pringle testified that from the time of Ford's birth on October 26, 1991, until her family was moved on November 16, 1994, Ford lived at 2114 Taney Terrace and spent no significant amount of time at any other residence, in any other building or even outside. She also noted that unlike his four siblings, Ford had a habit of putting his toys and his hands in his mouth when he was growing up. She then offered into evidence the laboratory tests that had been performed on Ford beginning in October of 1992, when he was only one year old. Those tests indicated the following blood lead values in micrograms per deciliter:

| DATE | Bpb. (ug/d$l$) |
| --- | --- |
| 10-29-92 | 16 |
| 12-18-92 | 9 |
| 09-20-93 | 22 |
| 12-09-93 | 23 |
| 03-28-94 | 17 |
| 09-22-94 | 55 |
| 10-18-94 | 19 |
| 10-19-94 | 21 |
| 11-01-94 | 28 |
| 12-24-94 | 26 |
| 01-19-95 | 28 |
| 04-06-95 | 25 |
| 08-24-95 | 21 |

(Reproduced Record, Volume I at 110a.) To explain the meaning of those test results, Pringle offered into evidence the expert medical testimony of John Rosen, M.D. (Dr. Rosen), a pediatrician and an expert/pioneer in childhood lead poisoning,[5] who stated that lead poisoning was defined in the United States by the Department of Health and Human Services as a blood lead value that was equal to or greater than 10 micrograms per deciliter. (Dr. Rosen's January 24, 2003 deposition testimony at 42, 44.)

Dr. Rosen, who never examined Ford but only issued a report on December 4, 2000, regarding his blood lead values based upon his medical history and blood tests, further explained that lead·was a neurotoxic agent that could cause brain damage and cognitive impairment; the younger the child, the greater the impact a neurotoxic agent such as lead had; and Ford's blood test results from age one showed that he suffered from lead poisoning. Dr. Rosen opined that the source of his lead poisoning was from his home at the 2114 Taney Terrace address due to the concentration of lead in the lead-based paint in the home compared to any other potential source that may have ever entered his environment during the first year of his life and, thereafter, such as living close to a highway which Ford did. (Dr.

5. Dr. Rosen testified that in 1972, he started a clinic and subspecialty group for the treatment, management and diagnosis of child-

hood lead poisoning. (Dr. Rosen's January 24, 2003 deposition testimony at 8.)

Rosen's January 24, 2003 deposition testimony at 60.) Dr. Rosen came to this conclusion after evaluating Ford's environmental history, family history and medical history, including chelation therapy, birth records, milestones, where he was living, and his potential environmental or real environmental exposure to lead. (Dr. Rosen's January 24, 2003 deposition testimony at 57.) Dr. Rosen also explained that the change in Ford's blood lead levels from 1992 to October of 1994, when it was at its highest, most likely indicated that Ford had started to become mobile and was gaining access to more space and more paint chips around the house. (Dr. Rosen's January 24, 2003 deposition testimony at 63.) He also explained that even though Ford had undergone chelation therapy, his blood level was expected to and did remain high in 1995, even though Ford was not ingesting any more lead-based paint because there was a redistribution of lead within his body, and some of that redistribution got back into the blood stream and elevated the blood lead value. (Dr. Rosen's January 24, 2003 deposition testimony at 67.)

Dr. Rosen also testified he believed that as a result of Ford's earlier childhood lead poisoning, Ford would require medical monitoring in the future at a cost of $3,000 annually until he reached age 18 and approximately $5,000 per year thereafter to check for specific adverse health effects of lead, including cardiovascular disease, kidney disease, peripheral neuropathy, kidney disease, ongoing cognitive deficits and cancer. (Dr. Rosen's January 24, 2003 deposi-

tion testimony at 81.) Dr. Rosen stated that the "odds ratios for these diseases occurring in adulthood as a result of childhood lead poisoning have also been established in the literature and they are highly significant. They range from roughly 2 to 3.5 as odds ratios which mean that such an individual as Tyree or a population of individuals such as Tyree are at large increased risk for developing these diseases later on." (Dr. Rosen's January 24, 2003 deposition testimony at 83.) He also believed that Ford would require specialized educational services consisting of attendance at a school with a high teacher to student ratio.[6]

Finally, to prove that Ford suffered brain damage from the lead poisoning, Pringle offered the expert testimony of Jay Schneider, Ph .D. (Dr. Schneider), a neuroscientist and a professor in the department of neurology at Thomas Jefferson University, who was experienced in dealing with childhood lead poisoning and determining the impact of environmental neurotoxins on the brain function and behavior. He testified that he met with Ford to perform testing in January of 1999; however, prior to that meeting, he reviewed his medical records, blood lead levels, birth records and other early developmental medical history. Dr. Schneider stated that Ford's medical records revealed Ford was born on October 26, 1991, and prior to his birth, Pringle had a normal pregnancy and did not have a history of smoking, drinking or using drugs during her pregnancy. Dr. Schneider then testified that he spent many hours performing

**6.** Dr. Rosen recommended the following in his December 4, 2000 written report:

Tyree should be attending a school now with a high teacher to student ratio and with a combined program in academics, psychotherapy and occupational training. This type of multi-disciplinary educational program is optimally found within a private

school (in my experience, private schooling of this type costs about $20,000 to $30,000 per year). At the very least, he should be receiving daily tutoring with homework and psychologist/psychiatrist social worker counseling 2–4 times weekly.
(Reproduced Record at 111a.)

numerous neuropsychological and neuro-functional tests[7] on Ford with many breaks interspersed to determine his current levels of basic motor, cognitive and behavioral performance resources and their impact on his educability and ability to execute activities of daily living. He stated that those tests revealed "impairments affecting fine motor skills, visuospatial abilities, auditory attention, and memory for verbal and visual information. In addition to these impairments, there are also indications of weakness in executive functioning involving non-verbal concept formation and attention set shifting." (Reproduced Record, Volume I, at 272a.) Dr. Schneider opined that Ford's functional impairments were due to brain damage caused by lead exposure as "examination of the patient's medical history revealed that the only neuropsychologically significant fact was lead exposure." (Reproduced Record, Volume I, at 272a.) He specified that Ford's mental deficits were not hereditary because "we're not talking about brightness. We're not talking about school performance here. We're talking about brain injury. It's different. The pattern of results that we see is indicative of brain injury." (January 28, 2003 hearing transcript at 92.)

In its defense, the Authority also offered medical experts to support its contention that lead-based paint did not cause Ford to be brain damaged, and, in fact, that he was not brain damaged. Charles Brill, M.D. (Dr. Brill), an expert in pediatrics and child neurology, testified that he examined Ford on February 2, 2001, and based on his examination and the tests he performed, he concluded that Ford's neurological exam and cognitive exam results were all within the normal range and Ford was not brain damaged. Dr. Brill stated that he reviewed Ford's blood test results from when he was young, and despite the high blood lead levels, he did not believe the lead had any physical effects on Ford. (January 31, 2003 hearing transcript at 131.) He specifically noted that Ford's grades in his first four years of school were all A's and B's and attributed his improvement in fifth grade to a teacher that "must have really turned him on." Dr. Brill agreed with Dr. Rosen that Ford should undergo medical monitoring because every adult should undergo medical monitoring regardless of their lead levels, but not because he was prone to cancer, kidney disease or high blood pressure. He noted that Ford showed no signs of cancer, peripheral neuropathy, high blood pressure or kidney disease when he examined him. On cross-examination, however, Dr. Brill admitted that he omitted looking at some of Ford's grades for his first four years of school which included mostly C's and D's under personal and social growth and even four F's in grade four. He also admitted that he only spent about one to one-and-one-half hours with Ford, and he did not administer the WISC or any other standardized tests other than the Slosson IQ test, which was a printed series of questions for his age primarily consisting of language questions. He also stated:

> The other part of my assessment was having him write his name, copy the figures that I did, list and define certain words on it, ask him to identify numbers, perform calculations, write numbers.

(January 31, 2003 hearing transcript at 132.) Finally, when the trial court judge asked Dr. Brill as a doctor within the field

---

7. Dr. Schneider stated he performed the following tests: 1) Wechsler Intelligence Scale for Children–III (WISC); 2) Purdue Pegboard; 3) Rey Osterrieth Complex Figure Test; 4) Conners' Continuous Performance Test; 5) Brief Test of Attention; 6) Children's version of California Verbal Learning Test; and 7) Wisconsin Card Sorting Task.

which test was most reliable, the WISC or Slosson, Dr. Brill stated he was "sure WISC would be considered more reliable." (January 31, 2003 hearing transcript at 159.)

The Authority also presented the testimony of psychologist Neil Hoffman, Ph.D. (Dr. Hoffman), an expert in neuropsychology with experience in evaluating children with elevated blood lead levels. He stated that he also evaluated Ford by giving him many of the same tests that Dr. Schneider had and that some of the results on those tests were the same, but he did not reach the same conclusions. Dr. Hoffman testified that his results indicated Ford was in the generally low average-average range of intelligence as was fairly accurately represented by his WISC–III test results. Ford's academic achievement testing results showed that his reading and spelling were progressing as expected while his math skills lagged somewhat behind; however, Dr. Hoffman noted that Pringle had similar if not more significant problems in math at the same age. Dr. Hoffman stated that there was no evidence to indicate that any inefficiencies documented on testing were directly related to or caused by his elevated blood lead levels. (February 3, 2003 hearing transcript at 203.) He also noted that some of the tests that Dr. Schneider performed on Ford were not suitable for children of his age so that Dr. Schneider's conclusions, diagnoses and opinions that he drew from those tests were questionable. (February 3, 2003 hearing transcript at 185–186.) On cross-examination, however, Dr. Hoffman admitted that when Ford became tired during testing, he did not force him to complete a test because he assumed the test result would not be good after that time. (February 3, 2003 hearing transcript at 238.) He also admitted that Ford had suffered from lead poisoning and had spatial organization and language processing inefficiencies, math deficiencies, attention lapses and motor restlessness issues. (February 3, 2003 hearing transcript at 242, 251.)

The Authority also offered the testimony of Georgette Galbreath (Galbreath), the Authority's Assistant General Manager for Environmental Services and Inspections, to show that there were other sources of lead that could have caused Ford's lead poisoning. Galbreath stated that she held that position since the year 2000 and was familiar with the development where Ford lived when he allegedly suffered lead poisoning from lead-based paint at Taney Terrace. She testified that abutting the development was a refinery at which gasoline, diesel fuel, jet fuel, butane, asphalt cement, kerosene and lubricating oils were manufactured and had been manufactured since the 1930's. She further stated that there was a current remediation project on Authority property underway in the vicinity of that refinery. Galbreath stated that as part of the remediation project, there were recovery wells on Authority property for the collection of waste products that the Defense Department would come out and pump on a weekly basis. It was her understanding that the material coming out of the recovery wells was coming from the storage tanks at the refinery, which belonged to the Defense Department. She stated that what was collected looked like some type of petroleum product. Galbreath stated while she was getting complaints from Authority residents of seepage, contamination and gasoline-type odors in the sewer system, they were recent complaints.

■ Finding Pringle and Ford's evidence more compelling than the Authority's, at the conclusion of the bench trial, the trial court entered judgment in favor of them on Count I and Count II after finding that the Authority was negligent

and negligent *per se* and that the Authority breached an implied warranty of habitability. They were awarded $210,000 in damages on the negligence claim and $5,832 in damages on the breach of the implied warranty of habitability claim, the amount of rent that Pringle had paid the Authority during the time she had lived at 2114 Taney Terrace with Ford.[8] The trial court found against Pringle and Ford on the remaining three counts—IX, X and XIII—and against the Authority on its counter-claim of contributory negligence. The Authority filed a motion for post-trial relief, which the trial court denied. This appeal by the Authority followed.[9]

The Authority contends that the trial court erred in denying its post-trial motions because:

● Pringle failed to timely file a notice of claim within six months from the date of injury as required by 42 Pa.C.S. § 5522(a);

● No evidence was presented that the Authority's negligence caused Ford's lead exposure;

● The trial court erred in awarding damages for breach of an implied warranty of habitability because contract damages were not damages that were suffered by Ford and no implied warranty of habitability cause of action exists in federally funded housing; and

● The trial court erred in awarding damages for medical monitoring because Ford did not prove all of the essential elements for such a cause of action.

We will address each of these arguments *in seriatim.*

## A. NOTICE OF CLAIM

The Authority first contends that the trial court erred in denying its motion for post-trial relief because Ford's claims were barred due to Pringle's failure to timely file a notice of a claim within six months from the date of injury as required by 42 Pa.C.S. § 5522(a).[10] The Authority alleges that the date of Ford's injury was in 1992 when it was first determined that he suffered from lead poisoning. As a result, the Authority alleges it was prejudiced because evidence could not be preserved or tested, e.g., lead-based paint chips could not be taken from the residence for analysis that allegedly caused Ford's brain damage. 42 Pa.C.S. § 5522(a) provides the following:

(a) **Notice prerequisite to action against government unit.**

(1) Within six months from the date that any injury was sustained or any cause of action accrued, any person who is about to commence any civil action or proceeding within this Commonwealth or elsewhere against a government unit for damages on account of any injury to his person or property under Chapter 85 (relating to matters affecting government units) or otherwise shall file in the office of the government unit, and if the action is against a Commonwealth agency for damages, then also file in the office of the Attorney General, a state-

---

8. The trial court later added delay damages in the amount of $39,655.69 for a total judgment against the Authority in the amount of $255,487.69.

9. When reviewing the trial court's denial of post-trial motions, our scope of review is limited to determining whether the trial court abused its discretion or committed an error of

law. *Johnson v. City of Philadelphia,* 808 A.2d 978 (Pa.Cmwlth.2002).

10. The Authority actually argues that Pringle's claim was barred by sovereign immunity. However, the Authority does not cite to any statute that would support this contention.

ment in writing, signed by or in his behalf, setting forth:

(i) The name and residence address of the person to whom the cause of action has accrued.

(ii) The name and residence address of the person injured.

(iii) The date and hour of the accident.

(iv) The approximate location where the accident occurred.

(v) The name and residence or office address of any attending physician.

(2) If the statement provided for by this subsection is not filed, any civil action or proceeding commenced against the government unit more than six months after the date of injury to person or property shall be dismissed and the person to whom any such cause of action accrued for any injury to person or property shall be forever barred from proceeding further thereon within this Commonwealth or elsewhere. *The court shall excuse failure to comply with this requirement upon a showing of reasonable excuse for failure to file such statement.*

(3) In the case of a civil action or proceeding against a government unit *other than the Commonwealth government:*

(i) The time for giving such written notice does not include the time during which an individual injured is unable, due to incapacitation or disability from the injury, to give notice, not exceeding 90 days of incapacity.

(ii) If the injuries to an individual result in death, the time for giving notice shall commence with such death.

(iii) *Failure to comply with this subsection shall not be a bar if the*

*government unit had actual or constructive notice of the incident or condition giving rise to the claim of a person.* (Emphasis added.)

The Authority further argues that even though the trial court found that the Authority had actual and constructive notice of the lead-based paint chips in Ford's unit, subsection (3)(iii) has no application because where the claim is against the **Commonwealth government,** which by definition includes an authority such as itself, failure to comply with the statute is a bar. Ford and Pringle, however, argue subsection (3)(iii) does apply because the Authority is a government unit, and it had both constructive and actual notice of the incident giving rise to Ford's injury; therefore, they were not barred from bringing this action.

■ "Commonwealth government" is defined as:

The government of the Commonwealth, including the courts and other officers or agencies of the unified judicial system, the General Assembly and its officers and agencies, the Governor, and the departments, boards, commissions, *authorities* and officers and agencies of the Commonwealth, but *the term does not include* any political subdivision, *municipal or other local authority,* or any office or agency of any such political subdivision or local authority.

42 Pa.C.S. § 102. "Government unit" is defined as:

The General Assembly and its officers and agencies, any government agency or any court or other officer or agency of the unified judicial system.

42 Pa.C.S. § 102. In *Allegheny County Housing Authority v. Cooley,* 64 Pa. Cmwlth. 252, 439 A.2d 1315 (1982), the issue was whether the Allegheny County Housing Authority was a local agency from whose action an appeal could be tak-

en to the trial court or whether it was an agency of the Commonwealth government whose action was subject to review only by this Court. We held that actions of authorities—including redevelopment, transportation and housing authorities—were municipal or other local authorities excluded from this Court's original jurisdiction by Section 102 of the Appellate Court Jurisdiction Act of 1970, which has since been repealed and replaced by identical provisions of the Judicial Code. Therefore, we determined that the Allegheny County Housing Authority was not an agency of the Commonwealth. *See City of Philadelphia v. Philadelphia Parking Authority*, 837 A.2d 1267 (Pa.Cmwlth.2003). In doing so, we relied on the definition of "Commonwealth government" found at 42 Pa. C.S. § 102. Similarly, here, the Authority also is not a Commonwealth government; therefore, by definition, it is a government unit and subsection (3)(iii) applies.

██ Because subsection (3)(iii) applies, the question is whether the Authority had actual or constructive notice *of the incident giving rise to Pringle's claim of Ford's injury, i.e., the existence of lead-based paint at 2114 Taney Terrace, not actual or constructive notice of the date of his injury which they allege is his brain damage as determined by the treating physician in 1999.* The trial court found and the evidence of record supports that the Authority had received both actual and constructive notice. The Authority fully investigated the allegations to confirm the existence of the lead paint at the residence as evidenced by its letters dated October

14, 1994, from Peduto to the Authority's legal counsel and dated November 4, 1994, indicating that the Authority had tested the painted surfaces of Pringle's unit for lead-based paint and it had confirmed the presence of lead. Therefore, its argument that it was prejudiced because lead-based paint chips could not be taken from the residence for analysis is unfounded. Also, the Authority had constructive notice of lead-based paint in the residence since March 7, 1974, through its own inspection and analysis as testified to by Glancey, whom the trial court judge found credible. Because the Authority was aware of all of the information required in 42 Pa.C.S. § 5522(a)(1)(i) to file a timely claim, the trial court did not err by denying the Authority's motion for post-trial relief on this issue.

**B. NEGLIGENCE**

██ The trial court found that Pringle and Ford prevailed on their negligence claim in Count I against the Authority because it breached its duty at 2114 Taney Terrace by failing to remove or encapsulate the lead-based paint it discovered, thereby leaving the residence in an unsafe condition. The trial court further found that under the federal regulations in effect from 1991 through 1994, Pringle and Ford proved negligence *per se*[11] because the Authority failed to notify Pringle of the dangers of lead-based paint and the precautions to be taken and, instead, gave her cans of paint so that she could cover up the paint that was chipping. The Authority contends that there was no evidence that

---

**11.** Negligence *per se* establishes both a duty and the required breach of duty where an individual violates an applicable statute, ordinance or regulation designed to prevent a public harm. *Braxton v. Department of Transportation*, 160 Pa.Cmwlth. 32, 634 A.2d 1150, 1152 (1993), *petition for allowance of appeal denied*, 539 Pa. 682, 652 A.2d 1326 (1994).

The law is well settled, however, that even having proven negligence *per se*, a plaintiff cannot recover unless it can be proven that such negligence is the "proximate" or "legal" cause of the injury. *Department of Public Welfare v. Hickey*, 136 Pa.Cmwlth. 223, 582 A.2d 734 (1990).

lead-based paint was even present at 2114 Taney Terrace, inside or outside, and under the federal regulations at the time of the events in question, it had no duty to remove all lead-based paint from its housing.

■ To recover damages for negligence, a plaintiff must prove: 1) a duty or obligation recognized by law; 2) a breach of that duty; 3) a causal connection between the breach of duty and the injury claimed by the plaintiff; and 4) actual loss or damage. *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 571 Pa. 580, 812 A.2d 1218 (2002). In order to meet their burden in this case, Pringle and Ford had to prove: 1) that 2114 Taney Terrace actually contained lead-based paint that was chipping; 2) the Authority had a duty to encapsulate or remove the peeling lead-based paint; 3) the Authority failed to do so; 4) the lead-based paint caused Ford to suffer lead poisoning; and 5) Ford suffered brain damage as a result of the lead poisoning.

The Authority initially denies that *any* lead-based paint existed at 2114 Taney Terrace during the time that Ford lived at that residence and contends that any peeling paint in the house was the non-lead paint that Pringle applied herself when she repainted the downstairs in 1994. As to the outside of the home, the Authority contends that there was no evidence of lead-based paint on door casings, door headers and window headers as Pringle's expert testified. In fact, the Authority points out that the only evidence presented at trial of peeling paint outdoors consisted of a photograph showing peeling paint on the front side of a post and on the residence next door to 2114 Taney Terrace; however, neither of those locations were shown to have any lead.

■ The totality of the evidence presented before the trial court, though, seems to paint a much different picture.

Pringle offered the Authority's inspection report of her residence dated March 7, 1974. That report indicated that a paint analysis had been conducted and readings for lead paint had been recorded requiring removal of paint in the living room, kitchen, hallway, first-floor bathroom and the front and rear bedrooms on the second floor. No evidence was presented by the Authority that such action had ever been taken or that the residence had been painted with lead-free paint to encapsulate the lead-based paint. The only testimony regarding the Authority's policy on painting its residences came from Glancey, who testified that there was a general policy to paint a residence every time a new person moved in or out of a unit. Additionally, Pringle testified that she complained to the Authority throughout the four years she lived at 2114 Taney Terrace that paint was chipping off the walls in her residence. She stated that the Authority annually inspected her residence, writing reports each time, but no one from the Authority ever came to scrape the paint, remove the paint or repaint the residence with lead-free paint. In fact, Pringle testified that she ultimately requested paint so that she could paint the inside of her home herself. Despite the fact that Pringle testified that there were inspection reports which recorded her complaints of the chipping paint, the Authority was unable to locate those reports to place them into evidence. There also was the October 1994 AET Environmental, Inc. report indicating that there was some lead-based paint both inside and outside the residence. Finally, there was the letter from Baker, the Authority's Senior Legal Counsel, to Peduto, the Lead–Based Paint Coordinator, dated October 14, 1994, stating that there were many components with a high reading of lead inside and outside of the residence and Ford had an elevated blood lead level

so she was recommending full abatement within 14 days or transfer of the tenants into a lead-free unit immediately. All of this evidence taken together supports the trial court's determination that there was lead-based paint at 2114 Taney Terrace while Ford resided there. Although the Authority alluded to the fact that Ford's blood lead levels were elevated due to visiting other people's homes where there was lead present and due to his surrounding environment, i.e., the refinery, the railroad stockyard, etc., it offered no scientific proof to back up its allegations. Therefore, the trial court decision was based on sufficient evidence that 2114 Taney Terrace actually contained lead-based paint.[12]

■ As to the second and third prong of the test, the Authority's only defense to its failure to encapsulate or remove the lead-based paint at 2114 Taney Terrace as required by the 1991 federal regulations was that it had no duty to do so because there was no lead-based paint present at that address. 24 C.F.R. Section 965.704, which was in force from 1991 through 1994, provides:

In family projects constructed prior to 1978 or substantially rehabilitated prior to 1978, the PHA shall visually inspect units for defective paint surfaces as part of a routine periodic unit inspections. If defective paint surfaces are found, *covering or removal of the defective paint spots as described in § 35.24(b)(2)(ii) of this title shall be required.* Treatment shall be completed within a reasonable period of time. (Emphasis added.)

Because there was substantial evidence upon which the trial court could find lead-based paint was present at 2114 Taney

---

12. The trial court stated the following in its opinion:

The paint in many areas of the interior and exterior of 2114 Taney Terrace was deteriorating with chipping and peeling lead-based paint throughout the duration of Appellees' tenancy. Appellees' Exhibit 27 and Appellant's Exhibit 29 (photographs). PHA did not dispute that there were areas of chipping and peeling paint throughout the interior and exterior of the residence. Inside the property there was chipping and peeling paint on ceilings and walls. The deteriorating paint existed on chewable surfaces and on high friction surfaces. On the exterior of the property, lead-based paint existed on door casings, door headers and window headers which are high friction surfaces. Appellant's Exhibit 5, AET Lead-in-Paint Test Report for 2114 Taney Terrace; N.T., 1/24/03, pp. 58–59. In addition, on the exterior there was lead-based paint that was chipping and peeling extensively on a post and column. Appellant's Ex. 29. The post not only had easily accessible chewable surfaces but its location near the front door meant the paint chips and dust could be easily tracked into the residence. *Id.*

(Trial court's September 10, 2003 opinion at 6.) Although Pringle testified that she did not allow Ford to spend much time outdoors, Dr. Rosen, whom the trial court found credible, testified that lead-based paint particles were brought in from the outside of the home where paint was peeling. Specifically, after reviewing Ford's medical records and the AET Environmental report, Dr. Rosen stated:

What I found to be significant was that there were both interior and exterior areas that were positive for lead-based paint. The interior sites were in large part limited to bathroom. The exterior sites were in large part door casings, door headers, window headers which—and door casings, all of which are friction surfaces. And friction surfaces whether including exterior friction surfaces, are well established in the peer-reviewed literature as yielding whenever one opens or closes a leaded window or open and closes a door that's considered to be a friction surface and that yields lead-based paint in small fine particles. It gains access to household dust. And lead-based paint in small particles in household dust is the most efficient way or manner or method unfortunately that children absorb lead into their body.

(Dr. Rosen's January 24, 2003 deposition testimony at 58–59.)

Terrace while Ford resided there, we agree with the trial court that the Authority had a duty to encapsulate or remove the lead-based paint, and it breached its duty under the then-existing federal regulation.

■ Regarding causation and damages, the Authority argues that while the lead-based paint may have been found to cause Ford to suffer lead poisoning, there can be no award of damages because Pringle knew that Ford was suffering from lead poisoning while living at 2114 Taney Terrace as evidenced by the number of times she took him for blood tests, yet she did nothing to change her living circumstances. What this argument ignores is that Pringle brought this negligence action on behalf of Ford, a minor, not for any damages she suffered from the lead-based paint, but for damages he suffered. Therefore, whether or not Pringle had knowledge of the lead poisoning is irrelevant for purposes of this claim.

The Authority also argues that it was erroneous to allow the testimony of Dr. Rosen and Dr. Schneider into evidence to prove causation for the following reasons:

● Dr. Rosen failed to provide any reason for ruling out other sources of lead as the cause of Ford's exposure;

● Dr. Rosen and Dr. Schneider relied upon general population studies as a basis for their opinions that Ford had brain damage due to lead poisoning rather than relying upon examinations and diagnoses; and

● Dr. Schneider admitted he was not qualified to diagnose Ford or opine that he suffered any injury.

We will address each of these contentions in order.

First, contrary to the Authority's contention that Dr. Rosen failed to give any reason for ruling out other sources of lead as the cause of Ford's exposure, he did

explain why he believed the source of Ford's lead poisoning was from Ford's home and why he ruled out the other sources. When Dr. Rosen was asked how he ruled out the fact that Ford lived close to a highway, and why that would not contribute to dust in the house, he responded:

A. Well, I mean quantitatively, the concentration of lead in lead-based paint is astronomically high compared to any potential other source or speculative other source of lead that may have ever entered his environment during the first year of life and thereafter. So that quantitatively to yield blood lead values of this magnitude, one had to be exposed to a high source lead- to a high source of lead that quantitatively had a lot of lead in it. And the reason that lead-based paint is the overwhelming cause of childhood lead poisoning in the United States today, as it was in 1943 or in the 1940s, is that the concentration of lead-based paint, particularly before it was banned by the Consumer Product Safety Commission in 1978, was extremely high. And that is—the high value of lead-based—of lead in lead-based paint is entirely consistent with his picture—clinical picture of childhood lead poisoning.

(Dr. Rosen's January 24, 2003 deposition testimony at 61 62). Clearly, Dr. Rosen addressed the question.

■ As to the Authority's contention that Dr. Rosen and Dr. Schneider relied upon general population studies to form the basis of their opinions rather than rely upon examinations and diagnoses, the trial court found that the Authority never presented any credible evidence to challenge the methodology used by either doctor. The trial court first noted that Dr. Rosen's methodology and the principles he employed in arriving at his conclusions in the

diagnosis, treatment and management of childhood lead poisoning had achieved scientific consensus in the community. Also, Dr. Schneider used methodology that was generally used and accepted in the field of neuroscience to evaluate brain injuries caused by neurotoxins. The trial court then explained:

> After the Superior Court's recent holding in *Trach v. Fellin*, 2003 Pa.Super. 53, 817 A.2d 1102 (2003), the law is clear:
>
> > *Frye*[*v. United States*, 293 F. 1013 (D.C.Cir.1923)] general acceptance standard requires only that the scientific community generally accept the principles from which the scientist is proceeding and the methodology the scientist is employing to reach his or her conclusions. Assuming the expert is properly qualified to testify ... his or her expertise appropriately brought to bear on the issue through use of generally adopted scientific principles and methodology should pass muster under *Frye*.
>
> > \* \* \*
>
> The methodology both experts employed was not novel in any way and is similar to that generally used by experts within their respective fields. In *Trach*,[13] the Superior Court emphasized:
>
> > *Frye* only applies when a party seeks to introduce novel scientific evidence ... [C]learly, our supreme court did not intend that trial courts be required to apply the *Frye* standard every time scientific experts are called to render an opinion at trial, a result that is nothing short of Kafkaesque to contemplate. Id. at 1109–1120. See *Haney v. Pagnanelli*, 830 A.2d 978, 2003 WL 21640564 (Pa. Supr.2003) (rejecting *Frye* analysis when doctor used simple deductive reasoning to testify regarding how the plaintiff was injured).

The substance of Ford's experts' opinion, that exposure to lead paint can cause cognitive impairment in children and, specifically, that exposure to lead paint did cause cognitive impairment to Ford, is generally accepted in the relevant medical community. It is not a novel scientific idea and is the basis for significant federal and state regulation regarding the use of lead-based paint.

(Trial court's September 10, 2003 opinion at 20–22.) Because the trial court found that the methodology used by Dr. Rosen and Dr. Schneider was in line with the scientific community, we find no error by the admission of their testimony into evidence.

▬▬▬ Regarding the Authority's contention that Dr. Schneider admitted he was not qualified to make a diagnosis and his testimony should not have been admitted or relied upon by the trial court, while Dr. Schneider stated that he did not diagnose patients because he was a scientist and not a medical doctor, his testimony reveals that his conclusion, i.e., that Ford suffered from brain damage, resulted from his studies as a scientist and the tests he performed on Ford. Dr. Schneider testified as follows:

Q. I believe you now have reviewed the tests that you gave to Tyree that day. What conclusions and what interpretations did you give to the data that Tyree provided through his performance on the tests?

A. Well, based on the results of the tests-

Q. By the way, Dr. Schneider, any opinion that you state and have stated up to this time will be given within a reasonable degree of neuroscientific certainty?

---

13. *See Trach v. Fellin*, 817 A.2d 1102 (2003).

A. Yes. Based on the results of the testing, I found that Tyree had impaired performance that affected his fine motor skills, visuospatial abilities, his auditory attention, his memory for verbal and information and, also, problems with executive functioning, particularly nonverbal concept formation, and attention set shifting.

Q. Why was that?

A. In my opinion, it was because of his early and high level of lead poisoning.

Q. What's the connection?

A. Lead is a neurotoxin, and lead will affect the functioning of a variety of brain systems and a variety of cognitive functions.

Q. How do you rule heredity? How do you know that he didn't inherit that brain function, the way he functions?

A. Well, this is—you know, if he was, for example, if you were to say that Tyree was just not a very bright kid, I mean, we're not talking about brightness. We're not talking about school performance here. We're talking about brain injury. It's different.

The pattern of results that we see is indicative of brain injury. And that pattern is relatively preserved functioning in some areas and very deficient functioning in other areas and, again, that's because different parts of the brain perform different functions.

Lead will affect different parts of the brain differently. Lead is not—it's not destroying the entire brain. There are certain parts of the brain that, for a variety of reasons, are more sensitive to the effects of lead, and this is typically what you see with lead poisoning more than with any other brain injury, that there are some areas of the brain that are more affected by the insult, the functions that are associated with those parts of the brain are deficient.

There are other parts of the brain that are relatively not affected by the insult, and the functions associated with those parts of the brain are still relatively intact.

When you see a pattern like that where there are some functions that are relatively preserved and other very specific functions that are deficient, that is a characteristic pattern of brain injury.

(January 28, 2003 hearing transcript at 91–92). Because Dr. Schneider's testimony explains from a scientific point of view why he concluded that Ford is brain damaged, the trial court did not err by allowing his testimony into evidence. Moreover, the trial court found the testimony of Dr. Rosen and Dr. Schneider credible linking the lead-based paint to Ford's lead poisoning and brain damage. Because, in a bench trial, the trial court judge is the finder of fact and the sole judge of credibility, *In re Funds in the Possession of Conemaugh Township Supervisors*, 562 Pa. 85, 753 A.2d 788 (2000), we will not disturb the trial court's credibility determination on appeal. Consequently, the Authority's contention that it was not negligent is without merit.[14]

---

**14.** Because the Authority breached its duty under 24 C.F.R. § 965.704 to cover or remove defective paint from 2114 Taney Terrace, the trial court properly determined that the Authority was also guilty of negligence *per se.* There was also sufficient evidence for the trial court to conclude that the Authority breached its duty under 24 C.F.R. § 965.703 requiring the Authority to provide notice to its tenants that its rental units might contain lead-based paint. That provision provides, in relevant part:

(a) General. Tenants in PHA-owned low income public housing projects constructed prior to 1978 shall be notified:

(1) That the property was constructed prior to 1978;

## C. BREACH OF IMPLIED WARRANTY OF HABITABILITY

■ Currently, Pennsylvania only recognizes an implied warranty of habitability in private residential leases. In *Pugh v. Holmes*, 486 Pa. 272, 405 A.2d 897 (1979), our Supreme Court adopted the implied warranty of habitability in private residential leases [15] to keep up with the realities of modern day leasing and did away with the previously followed doctrine of *caveat emptor*.[16] It viewed private residential leases as contracts that were entitled to the benefits of a warranty of habitability based on the change in the landlord-tenant relationship. While there once was an attitude that the lessee was at an arms-length dealing with the landlord, the change in the housing market required that tenants have as strong a bargaining position as the landlord when looking for suitable housing. This meant that the landlord and tenant agreed upon the price of rent; the tenant paid a market-based rent; and the landlord drafted the terms of the lease agreement, which the tenant agreed to abide by. Generally, those terms prescribed that the tenant would pay the rent and, in return, the landlord would maintain the property in good condition and make repairs as needed. Stating

that the warranty recognized that the modern tenant bargained for a dwelling house suitable for habitation and citing *Commonwealth v. Monumental Properties, Incorporated*, 459 Pa. 450, 467–468, 329 A.2d 812, 820–821 (1974), the Court in *Pugh* explained: "Functionally viewed, the modern apartment dweller is a consumer of housing services. The contemporary leasing of residences envisions one person (landlord) exchanging for periodic payments (rent) a bundle of goods and services, rights and obligations." The Court went on to state:

> [t]he implied warranty is designed to insure that a landlord will provide facilities and services vital to the life, health, and safety of the tenant and to the use of the premises for residential purposes.... In order to constitute a breach of the warranty, the defect must be of a nature and kind which will prevent the use of the dwelling for its intended purpose to provide premises fit for habitation by its dwellers. At a minimum, this means the premises must be safe and sanitary-of course, there is no obligation on the part of the landlord to supply a perfect or aesthetically pleasing dwelling.

*Pugh*, 486 Pa. at 289, 405 A.2d at 905. In so holding, our Supreme Court recognized

(2) That the property may contain lead-based paint;

(3) Of the hazards of lead-based paint;

(4) Of the symptoms and treatment of lead-based paint poisoning;

(5) Of the precautions to be taken to avoid lead-based paint poisoning (including maintenance and removal techniques for eliminating such hazards); and

(6) Of the advisability and availability of blood lead level screening for children under seven years of age.

Because the trial court found Pringle credible that she never received any information from the Authority, despite the fact that she took Ford bi-annually for blood tests, there was sufficient evidence to support its determi-

nation that it also violated its duty under 24 C.F.R. § 965.703 and was guilty of negligence *per se* for that reason as well.

15. *Pugh* also indicated that the warranty applied to commercial leases as well.

16. *"Caveat emptor"* is defined as "Let the buyer beware." Black's Law Dictionary 202 (5th ed.1979). This doctrine harkened back to feudal times when landlords actually leased land for a specified time, and rent was paid from what was grown or raised on the land and then sold. Landlords had no obligations to the tenant other than what was expressly agreed to between the two parties.

the right to bring a claim for breach of an implied warranty of habitability as a state law claim, but strictly limited the cause of action for a breach to leases between private lessors and lessees.

■ The Authority, however, contends that the award of damages for a breach of an implied warranty of habitability cannot stand because while Pennsylvania recognizes a breach of an implied warranty of habitability for private lease agreements, the Authority's housing is federally subsidized and regulated under the United States Housing Act of 1937, 42 U.S.C. § 1437 and Housing and Urban Development (HUD) regulations. It argues that the reasoning behind the adoption of the breach of an implied warranty of habitability by our Supreme Court in *Pugh* to address marketplace inequities between private landlords and tenants does not apply to the relationship between the Authority and its tenants, which is highly regulated by the federal government, and the rights and remedies under its leases are governed by federal law so that any marketplace analysis is misplaced and unnecessary.

In support of its position, the Authority directs our attention to the most often cited case in this area, *Alexander v. HUD*, 555 F.2d 166 (7th Cir.1977), which holds that public housing authorities cannot be liable for breach of an implied warranty of habitability. In *Alexander*, the Riverhouse Tower Apartments were constructed by a private non-profit corporation whose loan was secured by a mortgage that was insured by HUD. When the corporation defaulted on its loan, the mortgage was assigned to HUD. Subsequently, HUD initiated a foreclosure action and after a marshal's sale, HUD acquired title to the apartments. When the apartments deteriorated to the point that HUD decided to terminate the project, tenants were notified. Security deposits were returned to all but five of the tenants whose deposits were applied to the balance of their rents which were in arrears. Those tenants filed suit alleging that HUD breached a warranty of habitability implied in their leases relieving them of their obligation to pay rent. The Seventh Circuit rejected their claims and held that there was no warranty of habitability as a matter of federal law that could be applied against HUD, stating:

> We decline plaintiffs' invitation to follow these state court decisions implying a warranty of habitability in urban residential leases in the private sector. We decline to do so because we are not persuaded that such warranties should be implied in leases of dwelling units constructed and operated as public housing projects. In contrast to housing projects in the private sector, the construction and operation of public housing are projects established to effectuate a state national policy "to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income." *42 U.S.C. § 1401.*[17] As such, the implication of a warranty of habitability in leases pertaining to public housing units is a warranty that the stated objectives of national policy have been and are being met. We feel that the establishment of any such warranty that national policy goals have been attained or that those goals are being

---

17. *See also* "42 U.S.C. § 1437(d)(*l*)(2) of the General Program of the Low Income House Act which mandates that a housing authority ensure that its public housing project is maintained in a decent, sanitary, safe condition through the terms of its lease agreement." *Allegheny County Housing Authority v. Morrissey*, 651 A.2d 632 (Pa.Cmwlth.1994), *petition for allowance of appeal denied*, 541 Pa. 642, 663 A.2d 694 (1995).

maintained is best left to that branch of government which established the objectives.

*Alexander,* 555 F.2d at 171. The Seventh Circuit concluded by stating that while Congressional objectives expressed a desire to provide a decent home and suitable living environment for every American family, it was not HUD's absolute, fixed obligation to maintain suitable dwellings.

Ford, however, argues that Pennsylvania, following *Pugh,* has recently held there was a cause of action for breach of an implied warranty of habitability involving a public housing authority in the case of *McIntyre v. Philadelphia Housing Authority,* 816 A.2d 1204 (Pa.Cmwlth.2003). In that case, McIntyre, a minor, through his friend, filed a cause of action alleging he sustained injuries as a result of his exposure to lead-based paint in his public housing authority residence. On appeal, we held that breach of the implied warranty of habitability was a contract claim for which only contract remedies were available; therefore, because the jury was improperly permitted to award McIntyre tort damages for a contract claim when the action he brought was for bodily injury, the jury's award of damages for breach of the implied warranty of habitability as to that claim had to be reversed. All that was addressed in that case was whether the breach of the implied warranty of habitability could be brought under tort law, constituting a separate claim from negligence and making it inapplicable to whether such a claim exists as a contract claim in a public housing situation.

In order to decide whether we should follow the federal cases in this area, we need to determine whether the rationale that the Supreme Court set forth in *Pugh* should be extended to public housing. As we noted previously, a warranty of habitability exists in the strictly private relation-

ship because certain factors exist which create a bargained-for relationship on both the part of the landlord and the tenant. As our Supreme Court in *Pugh* explained, the tenant is now in a position to bargain for a suitable dwelling, and once a lease agreement is signed, a contract exists with an implied warranty of habitability based on principles of contract law.

In between private housing and public housing are the lease agreements for properties where, as in *Alexander,* private residential leases are turned into leases with a public body because HUD has either become the mortgagee in possession and/or the owner of housing that was previously privately owned. In those cases, courts have held that there is no warranty of habitability breached by HUD because HUD is merely ensuring the continued financing of the properties and nothing more. In federal cases, it is reasoned that there is no warranty of habitability because there is no traditional landlord-tenant relationship between HUD and the tenants as there are in private residential leases. This is so because HUD did not bargain with the tenants initially for the rental price, the tenants were not paying a reduced rental based on some government formula based on the amount of their income, and HUD did not make any agreement with them to maintain the property in exchange for the rent. HUD merely came to the rescue of the private owner who defaulted on its mortgage payments. Unlike the private lease agreement, there is no warranty of habitability because, although a government financing program is involved, the government has not bargained for anything and has not been involved with the tenants in any respect.

In the present landlord-tenant arrangement, unlike in *Alexander,* the Authority entered into a contract with the tenant directly, but an examination of that rela-

tionship shows that it involves a public government program, it has none or few of the characteristics of a private lease agreement, and the idea behind imposing the warranty of habitability does not exist. Here, the Authority entered into a lease agreement with Pringle utilizing a lease agreement that was drawn up and provided to it by the federal government. The terms were already designated as to what rights and responsibilities each party had, and the Authority could not alter the language of that agreement. The lease agreement provided the following:

TENANT AGREES:

1. To pay his rent on the due date specified.

2. To live in a peaceful way, respecting the rights of his neighbors to privacy, quiet, health, and safety. This agreement extends to members of tenant's family.

3. To give Management fifteen (15) days' written notice before moving.

4. To fill out annually (bi-annually for elderly tenants), upon the request Management, signed application for continued occupancy, and furnish to Management all information requested in connection with such application in accordance with existing Admission and Continued Occupancy Policy. Said application, along with the initial application for occupancy, shall become a part of this lease, as though fully and completely set forth herein. Tenant further agrees that this lease may be terminated upon any change in the number of occupants which would place said number in excess of that allowed by applicable rules and regulations.

5. To pay for repairs to all property intentionally or negligently damaged by the tenant, his family, dependents, or guests.

6. To pay a security deposit in the amount of $34.00 to be used by Management at the termination of this lease toward reimbursement of the cost of repairing any intentional or negligent damage to the dwelling unit caused by the tenant, his family, dependants or guests, and any rent or other charges owed to Management by the tenant. Payment of the security deposit is to be made upon occupancy, or by payment of $___ upon occupancy, and $___ per month for the following ___ months until the balance is paid.

7. To report to Management on maintenance problems and damage to the dwelling unit within 24 hours as a condition of their being timely repaired.

8. To pay charges for excess utilities used on the premises where the amount of such charges can be fairly established, pursuant to HUD Circular RHM 7465.7.

9. Not to sublet his dwelling unit.

10. To allow only those persons listed on an approved application for occupancy and or continued occupancy to occupy the dwelling unit.

11. To allow Management reasonable access to inspect or repair and or modernize the dwelling unit. Whenever it is determined that the condition of the dwelling unit is in violation of applicable ordinances, regulations, statutes or laws, Tenant agrees to accept reasonable alternative housing, either temporarily or permanently, at the sole discretion of Management. Where the condition of the unit is due to the fault of Management, and Management determines that alternative housing is necessary or desirable, Management shall bear the expense of moving if tenant would otherwise be forced to bear the costs. If such costs are otherwise recoverable by Tenant, Tenant agrees to reimburse Management for its costs incurred.

12. To use his dwelling unit for strictly residential purposes only.

13. Not to place any additional locks or locking devices on the entrance door other than a chain latch on the inside of the entrance door.

14. Tenants of Scattered Site units are responsible for the removal of ice and snow from the front of their dwelling unit. In cases of more than one family in a building, it will be the responsibility of the first floor tenant. A rent credit will be allowed to cover the reasonable costs of needed materials.

15. Tenant may request an interim rent reduction when entitled under applicable rules and regulations. This request must be made in writing and signed by the tenant.

16. Tenant may request a rent extension based upon a showing of good cause. This request must be made in writing and signed by the tenant.

16. [sic]Tenant may request permission to pay rent twice a month if Tenant shows good cause. This request must be made in writing and signed by the Tenant.

18. Tenant may request a hearing pursuant to HUD Circular RHM 7465.9 concerning Management action in conducting inspections, collecting or adjusting rents, imposing extra charges, performing maintenance, scheduling evictions, or denying transfers. This request must be in writing and signed by the tenant.

19. Tenant further agrees and understands that the terms and conditions of this lease may be changed by Management after thirty (30) days written notice of such change.

20. Upon termination of the lease, Tenant must advise Management in writing as to his forwarding address.

21. Tenant agrees to abide by regulations promulgated from time to time by Management. The regulations shall become an integral part of the lease. The applicability of such regulations to Tenant may be challenged by Tenant through the Grievance Procedure established pursuant to HUD Circular RHM 7465.9.

MANAGEMENT AGREES:

1. To maintain the dwelling unit and unassigned community areas appurtenant thereto in good condition and in compliance with all applicable laws, rules and regulations, including local housing codes and HUD regulations. If Management fails to perform its obligations hereunder, Tenant may raise the defense of rent abatement as provided under HUD Circular RHM 7465.8. Tenant may also timely request a grievance hearing as provided under HUD Circular 7465.9.

2. To provide the following utilities in reasonable amounts, including heat when necessary or in accordance with local law, and to charge Tenant only for utilities where usages is deemed excessive:

_____

Management will not be responsible for failure to provide utilities by reason of any cause beyond its control, nor for consequential or incidental damages for failure to provide such utilities.

3. To make properly requested repairs promptly, reserving the right to charge Tenant for repairs to the property intentionally or negligently damaged by tenant, his family, dependants or guests.

4. (not legible on document)

5. To give Tenant thirty (30) days notice prior to termination of this lease. Said written notice shall be in clear and

understandable terms and shall include the following:

(a) A statement of the reason for the action and the facts upon which the action is based; and

(b) A statement of the tenant's right to request a hearing and the means by which a hearing may be requested.

6. To provide Tenant with an opportunity to inspect and a written statement of the condition of the unit and equipment at the beginning of the tenancy and at the end thereof. If Tenant fails to contest the accuracy of such statements within 30 days of receipt, such statements shall be incontestable.

7. To terminate the lease or evict Tenant only for a breach of terms of this lease, including but not limited to the following:

(a) Non-payment of rent; or

(b) Serious, intentional or negligent damage to the dwelling unit; or

(c) Serious interference with the rights of another or others; or

(d) Allowing persons other than those listed on the statement of occupancy to reside in the dwelling unit; or

(e) Use of the premises not permitted under this lease; or

(f) Income that exceeds the maximum allowable.

8. To return the security deposit, less charges for damage or rent arrears, within thirty (30) days upon termination of the lease on condition that the Tenant duly advised Management in writing as to his forwarding address.

In signing this lease, the applicant certifies that he has not knowingly misrepresented any facts which were used in determining his eligibility for public housing. Such misrepresentation shall render this lease null and void, and of no force and effect.

Unlike a private lease agreement, this lease agreement indicates that the Authority manages the property while HUD controls what may or may not happen at the property, and neither the Authority nor the tenant has the right to negotiate the terms of the agreement. Additionally, unlike a private lease agreement, the price of rent is pre-determined by HUD to the extent that Pringle was only required to pay rent based on a certain percentage of her income as determined by a calculation devised by the federal government. The remainder of the rent due, as also determined by the federal government, was solely subsidized by the federal government and given to the Authority. Neither Pringle nor the Authority had bargaining power over the amount of her rent. Also, Pringle, unlike a private tenant, is entitled to a hearing as to whether the Authority is carrying out its maintenance responsibilities.

■ Comparing the private lease agreement situation to the Authority lease agreement, even though the Authority owns the housing project, the federal government controls the relationship, including what is in the lease: its terms, the price of rent and even who can be a tenant. Moreover, the federal government funds the Authority and provides it with detailed regulations on how it operates. What is involved here is not a marketplace lease entered into by two bargaining parties as envisioned by *Pugh*, but a public government program in which the Authority, under federal law, is required to provide safe and habitable housing. Because the concept of "warranty of habitability" was adopted to address the inequities in the marketplace and public housing is anything but marketplace housing, the reasoning set forth in *Alexander* is equally applicable, and we hold that the contract action for warranty of habitability does not apply

to public housing. Consequently, the trial court erred in determining that a cause of action for a breach of an implied warranty of habitability could stand against the Authority, and that portion of the award for damages for breach of warranty of habitability is reversed and the judgment. is reduced by $5,832.[18]

### D. DAMAGES FOR MEDICAL MONITORING

■■■ Finally, the Authority contends that the trial court erred in awarding damages for medical monitoring because Pringle and Ford did not prove all of the following seven essential elements for such a cause of action:

1) exposure greater than normal background levels;

2) to a proven hazardous substance;

3) caused by the defendant's negligence;

4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease;

5) a monitoring procedure exists that makes the early detection of the disease possible;

6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and

7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

*Redland Soccer Club, Incorporated v. Department of Army,* 548 Pa. 178, 195–196, 696 A.2d 137, 145–146 (1997). More specifically, the Authority argues that Pringle

failed to prove element number six: that the prescribed monitoring regime would be different from that normally recommended to the general public absent an exposure to lead. The Authority points out that Pringle's expert, Dr. Rosen, only proposed a medical monitoring program that consisted of medical tests recommended for all people, regardless of whether they had exposure to lead or elevated blood lead levels.

After reviewing Dr. Rosen's recommended medical monitoring program, we disagree with the Authority's recap of his recommendations. In his written report dated November 4, 2000,[19] Dr. Rosen stated that Ford was at high risk for developing medical consequences of lead poisoning in the future consisting of kidney disease, peripheral neuropathy, hypertension and cancer of the kidney, lung and gastrointestinal tract. He then stated:

> As a general outline of a medical monitoring program through 18 years of age, Tyree should be assessed 3–4 times annually by a pediatric specialist with expertise in the field of childhood lead poisoning and the latent effects of severe childhood lead poisoning in the adolescent years. Blood lead, ferritin and complete blood counts would be repeated until three successive BPbs are less than 10 ug/dl at an interval of three months. Thereafter, a chem. 20, ferritin and complete blood count would be repeated 3–4 times annually. Neurobehavioral-cognitive testing would be carried out every 12–18 months, as would a creatinine clearance and measurement of retinol-binding in the same sample of urine.

---

18. Because we have determined that the Authority was not liable for damages for breach of an implied warrant of habitability, we need not address its argument that no award was possible because Ford was not a party to the lease, he did not make the rent payments, and

the rent payments made by Pringle were not recoverable by Ford.

19. This report was attached to his deposition transcript and made part of the record.

As a general outline, beginning at age 19, Tyree's medical care should be carried out by an internist with expertise in the identification of early signs and symptoms of latent consequences of lead exposure during childhood. Two visits annually to this specialist are indicated. Annually, Tyree would have a complete blood count, chem. 20, serum ferritin, EKG and chest x-ray. Annually, a creatine clearance test would be carried out, in addition to measurements of retinol-binding protein in his urine. Additional testing that may become indicated includes rennin, angiogram, meta-nephines, renal ultrasound, protein electrophoresis, electro-myogram, nerve-muscle biopsy and MRI/CT examinations to detect suspected cancer.

(Dr. Rosen's written report of November 4, 2000, at 2–3.) Because Dr. Rosen clearly delineates specific tests that are meant for victims of lead poisoning and are not "recommended for all people, regardless of whether they had exposure to lead or elevated blood lead levels," the trial court did not err by awarding damages for medical monitoring.

Accordingly, for all of the above stated reasons, the order of the trial court is affirmed in part and reversed in part.

### ORDER

AND NOW, this *29th* day of *March,* 2004, the order of the Court of Common Pleas of Philadelphia County, dated July 3, 2003, is affirmed in part and reversed in part.